# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Maplebrook Estates Homeowner's Association, Inc., | Case No. 21-cv-01532 (SRN/DJF) |
| Plaintiff, | |
| v. | **ORDER** |
| Hartford Fire Insurance Company, | |
| Defendant. | |

Alexander M. Jadin and David A. Brandis, Smith Jadin Johnson, PLLC, 7900 Xerxes Avenue S., Suite 2020, Bloomington, MN 55431, for Plaintiff.

Jonathan D. Day and Paulette S. Sarp, 250 Nicollet Mall, Suite 1150, Minneapolis, MN 55401, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Hartford Fire Insurance Company's ("Hartford") Motion for Summary Judgment [Doc. No. 65] and Plaintiff Maplebrook Estates Homeowner's Association, Inc.'s ("Maplebrook") Cross Motion for Summary Judgment [Doc. No. 73]. For the following reasons, the Court remands to the Appraisal Panel.

## I.    BACKGROUND

### A.    Hailstorm and Insurance Policy

Maplebrook manages a non-profit, common interest residential community in Brooklyn Park, Minnesota. (Notice of Removal [Doc. No. 1], Ex. 1 (Compl.) ¶ 1.) On

1

August 5, 2019, a storm caused hail and wind damage to eighty-nine of Maplebrook's buildings. (*See* Miller Decl. [Doc. No. 68], Ex. 1 (Miller Damage Report); Brandis Decl. [Doc. No. 74], Ex. E (Appraisal Award) at 1.) Although various parts of the buildings ultimately needed repair, this dispute concerns the repair of damaged siding.

At the time of the storm, Hartford insured Maplebrook's buildings under a Special Multi-Flex Business Insurance Policy ("Policy"). (Brandis Decl., Ex. A (Policy) at 5.)[1] The Policy reads, in relevant part, "We will pay for direct physical loss of or direct physical damage to . . . Covered Property caused by or resulting from a Covered Cause of Loss." (*Id.* at 119.) Covered causes of loss include "windstorm or hail." (*Id.* at 107.)

When damaged, Covered Property is subject to "Replacement Cost." (*Id.* at 23.) For such property, the Policy provides:

> [W]e will determine the value of Covered Property at the actual amount spent to repair, replace or rebuild the damaged property as of the time of the loss or damage, at the same site or another site, subject to the following:
>    a.   We will not pay more for lost or damaged property than the least of
>       (1)   The Limit of Insurance applicable to the lost or damaged property,
>       (2)   The amount it costs to replace, on the same premises, the lost or damaged property with other property:
>          (a)   Of comparable material and quality; and
>          (b)   Used for the same purpose; or
>       (3)   The amount you actually spend that is necessary and reasonable to repair or replace the lost or damaged property with other property:
>          (a)   Of comparable material and quality; and
>          (b)   Used for the same purpose . . . .
>    b.   We will pay you on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced.

---

[1] When citing to the Policy the Court uses the blue docket pagination at the top of the page.

(*Id.* at 123.)

Minnesota law requires all hail insurance policies to provide for an appraisal process. *See* Minn. Stat. § 65A.26 (2023). The Policy thus outlines:

> If [Hartford] and [the insured] disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>     a.   Pay its chosen appraiser; and
>     b.   Bear the other expenses of the appraisal and umpire equally.
> If there is an appraisal, we will still retain our right to deny the claim on the grounds that it is not covered under this policy.

(Policy at 103.)

Finally, the Policy requires Maplebrook to take certain actions when a covered loss occurs. (*See id.* at 106.) Of note here, Maplebrook must "Protect Property":

> Take all reasonable steps to protect the property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim . . . [Hartford] will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss.
>     Also, if feasible, set the damaged property aside and in the best possible order for examination.

(*Id.*)

## B.    Claim Submission

After the hailstorm, Maplebrook initiated the claims process. The record is silent as to how Maplebrook reported its loss, however on September 9, 2019, Hartford acknowledged by email receipt of the claim. (Brandis Decl., Ex. C (Sept. 9, 2019 Email).)

In the ensuing months, Maplebrook entered into a series of contracts to assess and repair the damage to its buildings.

On September 24, 2019, Maplebrook retained a public adjuster, James Pierce, d/b/a Gavnat and Associates ("Gavnat"), to represent it in the insurance claim process. (First Sarp Decl. [Doc. No. 70], Ex. C (Authorization Agreement).) Under their contract, Mr. Pierce would receive as compensation 10% of the total insurance proceeds paid by Hartford to Maplebrook. (First Sarp Decl., Ex. D (Public Adjuster Contract).)

That same month, Maplebrook hired Capital Construction, LLC ("Capital") as its general contractor to "perform the repair and replacement work specified in [Maplebrook's] insurance company's estimate of repairs." (First Sarp Decl., Ex. E (Construction Contract).) Capital would receive as payment the proceeds from the insurance settlement and pay Gavnat's fee out of those proceeds. (*Id.*; First Sarp Decl., Ex. F (Muelken Dep.) at 25:12–26:2, 40:3–12.)

Finally, in early October 2019, Capital entered into an agreement with New Concepts Management, Maplebrook's property manager at the time, to act as a liaison between Capital and Maplebrook during the construction project. (First Sarp Decl., Ex. G (Project Oversight Contract) at 45; First Sarp Decl., Ex. H (McLarty Dep.) at 17:9–18:4.) Per the contract, New Concepts would receive 1% of the payments made to Capital on behalf of Maplebrook. (Project Oversight Contract at 46; Muelken Dep. at 27:22–31:1.)

For its part, Hartford retained J.S. Held, LLC ("J.S. Held") to determine the nature and extent of the hail damage to Maplebrook's properties. (Miller Decl. ¶¶ 2–3.)

### C.      Loss Estimates and First Undisputed ACV Payment

On October 2, 2019, Mr. Pierce sent Mr. Becker "the initial estimate for the roofs only." (First Sarp Decl., Ex. Y.) He noted that Maplebrook had pulled samples of the siding to send to ITEL, an independent laboratory that identifies construction materials matching those on an existing home. (*Id.*; Muelken Dep. at 6:11, 61:1–62:2.) To obtain the samples for ITEL, Mr. Muelken removed one-foot sections of siding from four or five buildings, corresponding to the colors used across Maplebrook's properties. (Muelken Dep. at 61:19–62:2; Brandis Decl., Ex. G (ITEL Report) (analyzing five samples).) Mr. Muelken did not conduct a close inspection or make a record of the siding's condition when he removed the samples. (Muelken Dep. at 61:1–65:2.)

 ITEL found that four of the five original siding products had been discontinued and were no longer available. (*See* ITEL Report.) It suggested alternative siding replacements "based on closest match to the original color and physical specifications." (*Id.*) These alternatives varied in their degree of similarity to the original siding. (*See id.*)

Also in October, Sean Miller, building consultant and vice president with J.S. Held, and two colleagues inspected Maplebrook's damaged buildings and recorded the number of hail strikes on each elevation. (Miller Damage Report; First Sarp Decl., Ex. K (Hartford Statement of Loss) at 7.) One building displayed as many as forty damaged siding areas, while some buildings had no visible damage. (Miller Damage Report; Muelken Dep. at 86:23–87:2.) Still others sustained a handful of hail strikes. (*See* Miller Damage Report.) Maplebrook does not dispute the overall accuracy of Mr. Miller's report. (*See* Muelken

Dep. at 87:6–9; First Sarp Decl., Ex. J (Pierce Dep.) at 78:1–25 (noting that although he found additional hits after Mr. Miller's report, Mr. Pierce had no record of them).)

On December 13, Hartford's adjuster Jay Becker sent Mr. Pierce the insurer's Statement of Loss. (Hartford Statement of Loss at 3.) The Statement, based on J.S. Held's preliminary estimates, assessed the undisputed actual cash value ("ACV")[2] of the claim as $3,442,778.08: the estimated replacement cost value ("RCV") of $6,348,856.46, less $2,016,078.38 in depreciation and Maplebrook's $890,000 deductible. (*Id.* at 5.) Hartford issued a payment of $3,442,778.08 to Maplebrook three days later. (*See* First Sarp Decl., Ex. L (Claim Payment Log) at 1.)

Along with the Statement of Loss, Mr. Becker sent J.S. Held's damage estimate reports for each building. (*See* Hartford Statement of Loss at 6–90.)[3] Under the heading "Scope recap," J.S. Held noted, "The vinyl siding will require some elevation replacement and some spot repairs, or replacement of pieces on other elevations due to the direction of the storm." (*Id.* at 7.) The "General Conditions" estimate included a line-item for "Job-site cargo/storage container" with an explanatory note: "Allowance for on site storage of salvaged siding, and other materials." (*Id.* at 8.) In the individual building estimates, siding-related line items noted, "Remove and replace one piece of siding identified with

---

[2] Actual cash value is "generally the cost to repair or replace an item with material of like kind and quality less depreciation or salvage." (First Sarp Decl., Ex. T at 7.)

[3] Hartford's exhibit only includes the general conditions estimate and the estimate for one building as an exemplar. (*See* First Sarp Decl. ¶ 12.)

damage . . . . Material provided by siding removed from other buildings/elevations." (*See, e.g.*, *id.* at 16.)

In his declaration, Mr. Miller explained that J.S. Held's estimates assumed the use of "harvesting" as a siding repair method. (Miller Decl. ¶ 7.) Harvesting, according to Mr. Miller, is a common, accepted technique: undamaged siding panels from buildings slated for full siding replacement are used to make color-matched spot repairs on buildings that sustained only minimal siding damage. (*Id.* ¶ 5.) Mr. Miller determined that the Maplebrook homes slated for full re-siding would provide "sufficient amounts of undamaged siding in all (4) colors that could have been harvested and used for insert repairs" in the homes with less damage. (*Id.* ¶ 8.) He opined that the panels to be harvested were in a sufficient condition to maintain their structural integrity during the process. (*Id.* ¶ 11.)

Several months later, in May 2020, Mr. Pierce sent Mr. Becker the loss statement prepared by Gavnat. (First Sarp Decl., Ex. N (Gavnat Statement of Loss) at 2.)[4] Regarding siding, Mr. Pierce wrote, "Your expert enlisted 'harvesting' into his bid[.] MapleBrook [sic] is claiming full siding replacement due to matching and not accepting using used products on their homes." (*Id.*) Like Mr. Muelken, Mr. Pierce never inspected the siding's condition to determine its suitability for harvesting. (Pierce Dep. at 77:1–18.)

___
[4] The record does not contain Gavnat's overall loss estimate. The exhibit includes the email from Mr. Pierce, the estimate for the general conditions, and the estimate for one set of buildings as an exemplar. (*See* Gavnat Statement of Loss.)

7

### D.       Homeowners' Input and Maplebrook's Decision

At some point, Maplebrook's homeowners learned of Hartford's proposal to perform harvesting and it became a point of contention in the community. (*See* First Sarp Decl., Ex. H (McLarty Dep.) at 55:19–56:1.) On June 12, 2020, Maplebrook's then-President, Dan Couture, sent a letter to homeowners. (First Sarp Decl., Ex. P (Couture Letter).) First, he shared that a special assessment vote had failed to receive the necessary two-thirds majority, but that 61% of homeowners had voted in favor. (*Id.* at 1.) He then continued:

> The message from these homeowners was clear: they didn't want their home repaired with re-used siding and told to wait more than a decade to receive the new siding their neighbor will get this year. The Board didn't like that option either—not with half our residents expected to sell their homes in the next 10 years. Acknowledging the wishes of this majority of voters, the Board consulted with our repair project partners to devise an alternative plan which delivers most of our original proposal—without the aid of a Special Assessment.
>
> **The Board is pleased to announce that EVERY building at Maplebrook will receive new roofs, siding and trim this year.** No harvested siding will be used. . . .
>
> We are enthusiastic about the potential transformation this project presents for our nearly 40-year old community. The Board adopted this revised plan for three major reasons:
>
> - Although the Special Assessment did not pass, the large majority of YES voters warranted the Board depart from the 'fix only what insurance will cover' option.
> - Maplebrook will save hundreds of thousands of dollars making these improvements now at Hartford insurance-negotiated contractor prices over replacement in 10+ years. . . .
> - All homeowners will receive the same exterior improvements as their neighbors—no one is left out. Everyone benefits from the improved curb appeal and price appreciation at resale provided by a significantly refreshed exterior.

(*Id.* (emphasis in original).)

The work would be funded, the letter explained, entirely through insurance proceeds and Maplebrook's reserve funds—rather than through a special assessment on the community. (*Id.*) Mr. Couture finally noted that depending on Maplebrook's pending negotiation over an additional $2 million in siding damages, some additional work that had been eliminated could be reconsidered. (*Id.* at 2.)

### E.      Second Undisputed ACV Payment

In late September 2020, Mr. Becker, on behalf of Hartford, emailed Mr. Pierce with an updated Statement of Loss. (First Sarp Decl., Ex. T (Sept. 2020 Hartford Statement of Loss).) He explained that Hartford would be making a payment to Maplebrook of $2,167,824.68, reflecting $467,365.47 in additional undisputed ACV and the release of $1,700,459.21 in applicable depreciation. (*Id.* at 2.) In the attached formal letter, Mr. Becker noted:

> Please be advised that as there remains a stark variance between our updated proposed settlement and your revised settlement demand, we respectfully reject your updated estimate at this time, however, our investigation is continuing in an effort to validate additional damage amounts.
> As our investigation is continues [sic], we request that any damaged property that has not yet been agreed to or accepted be left as is, if feasible, to ensure additional inspections of the damages can continue to occur, if necessary, in hopes of resolving this amicably.

(*Id.* at 5.) The payment was issued on September 28. (Claim Payment Log at 3.)

F.      **Repairs**

The siding repairs proceeded swiftly.[5] According to Mr. Muelken, eighty-eight of Maplebrook's homes had been completely re-sided with new materials by October 2020.[6] (Muelken Dep. at 55:4–10.) None of the existing siding was saved after removal from the buildings and Capital did not notify Hartford before its disposal. (*Id.* at 61:13–17, 66:5–8, 67:23–68:6; Pierce Dep. at 45:10–14.)

Mr. Muelken testified that Capital disposed of the old siding for two reasons:

> One, it's not common practice for us to store, save or try and salvage old siding. Two . . . due to the age, condition of the existing siding, taking the siding off was near impossible without damaging [it] . . . [S]o the condition of the siding of what was there was not able to be, A, salvaged and not damaged, and because of its age did not match other buildings. The association, because of those factors, before appraisal, decided to pay out of pocket to have uniform appearance for all the buildings because of those factors.

(Muelken Dep. at 57:23–58:14.) However, Mr. Muelken subsequently testified that, on a case-by-case basis, it is possible to methodically salvage siding for spot repairs at a greater labor cost. (*Id.* at 59:4–60:8, 65:3–66:4.) As noted above, Mr. Muelken did not inspect the condition of the siding on each damaged building to assess the feasibility of harvesting. (*Id.* at 61:1–65:2, 66:4.)

---

[5] The record does not identify when construction began.

[6] In addition to replacing all of the siding, Maplebrook elected to install fan-fold insulation beneath it to improve insulation. (Muelken Dep. at 31:5–32:18.) Maplebrook paid directly for the insulation upgrade as a "betterment" and does not request reimbursement for it from Hartford. (*Id.*) Maplebrook directly paid for a number of other betterments, such as to gutters and certain light fixtures, that were completed during the repairs. (*Id.* at 32:22–35:6.)

Mr. Pierce confirmed that, at the time of the siding's removal, he knew Hartford wanted to perform harvesting. (Pierce Dep. at 46:14–16, 49:6 ("Both Hartford and I were aware that there was a dispute.").) He testified that he believed Maplebrook had no responsibility to store old siding after its removal, and that "if [Hartford] wanted it, they should have taken it." (*Id.* at 46:19–25.) Although he "made Hartford aware that the siding was being replaced on multiple occasions," Mr. Pierce testified that he did not inform Hartford that the old siding would be thrown away. (*Id.* at 47:6–21.) Mr. Pierce further testified that Maplebrook did not conserve any samples of the old siding despite the likelihood of an appraisal because "[w]e didn't need it for our presentation." (*Id.* at 50:9–10.)

Like its commencement, the record does not reveal when construction was completed on all repairs. Nonetheless, Mr. Muelken testified that all construction suppliers and subcontractors had been fully paid for their work by the end of 2020. (Muelken Dep. at 73:19–24.)

### G.   Amount of Loss Dispute and Appraisal Hearing

On November 13, 2020, Mr. Pierce wrote to Hartford requesting an appraisal, as provided for in the Policy, because the amount of loss remained in dispute. (Brandis Decl., Ex. D (Nov. 13, 2020).) Maplebrook, through Mr. Pierce, named Adina Bergstrom as its chosen member of the three-person appraisal panel. (*Id.*) Brad Langerman, Hartford's appraiser, and Scott Moe, umpire, were the other panelists. (Appraisal Award at 2.)

The appraisal panel met in April 2021. (Appraisal Award at 3.) Mr. Pierce represented Maplebrook at the meeting, while Hartford did not send a representative.

(Pierce Dep. at 61:12–14.) Aside from Mr. Pierce's deposition testimony, there is no record of the appraisal panel's proceedings.

Mr. Pierce testified that he raised two areas of dispute to the panel. (*Id.* at 61:20–62:6.) The first related to siding repairs: Hartford's position, as related by Mr. Pierce, was that harvesting was the proper repair technique, while Maplebrook sought full replacement of each building's siding. (*Id.* at 61:23–62:3.) Because the siding panels had been discarded during the repairs, the appraisal panel did not have the opportunity to examine any samples. (*See, e.g.*, *id.* at 50:3–10.) The second dispute related to the difference in construction costs between 2019, when the damage occurred, and 2020, when the repairs were made. (*Id.* at 62:7–10.) In addition to presenting this information, Mr. Pierce also submitted to the panel a proposed award form. (*Id.* at 68:15–23.)

The proposed award form included tables with rows labeled with construction trades (e.g., siding or electrical) and columns labeled "2019 RCV" and "2020 RCV." (First Sarp Decl., Ex. Q (Proposed Award).) According to Mr. Pierce, the panel asked why the proposed award form called for two years of cost values. (Pierce Dep. at 69:18–20.) He responded that he had anticipated a coverage dispute over whether 2019 or 2020 construction costs applied, and he "wanted [the panel] to be the fact finder." (*Id.* at 69:21–25.)

## H.   Appraisal Panel's Award

The appraisal panel issued its award on April 20, 2021. (Appraisal Award at 3.) The panel largely adopted the format of the proposed award form, however the final document

omitted the 2020 RCV columns that Mr. Pierce had included as an alternative. (*Compare*

Proposed Award *with* Appraisal Award.)

The first page bears a table containing award amounts for ten construction trades:

| Award (ACV = Actual Cash Value & RCV = Replacement Cost Value) | | | |
|---|---|---|---|
| | | | |
| Category | 2019 ACV | 2019 RCV | |
| | | | |
| General Conditions | | $173,538.40 | |
| Roofing | | $3,788,283,65 [sic] | |
| Gutters | | $151,919.39 | |
| Soft Metals | | $637,594.19 | |
| Windows | | $267,197.49 | |
| Garage Doors | | $55,436.42 | |
| Chimney Caps | | $286,000.00 | |
| Deck Painting | $83,658.00 | $167,300.00 | |
| HVAC | $358,437.34 | $716,874.68 | |
| Permit | | $59,047.47 | |

(Appraisal Award at 1.)

The second page begins with a question taken from Mr. Pierce's proposed award form: "Is there a Reasonable Matching Replacement Siding of like kind and quality available? Please Check One Column and Sign." (*Id.* at 2.) One appraiser, Mr. Langerman, checked "Yes"; Ms. Bergstrom and Mr. Moe checked "No." (*Id.*) Below that question were instructions: if a majority of the panel checked "Yes," they were to proceed to Option 1; if a majority checked "No," they were to proceed to Option 2. (*Id.*) The rest of the second page is reproduced below:

| Option 1 – There is a reasonable siding of like kind and quality | | |
|---|---|---|
| | | |
| Category | 2019 RCV | |
| | | |
| Siding | N/A | |
| Electrical | N/A | |

| Option 2 – There is not a proposed reasonable siding of like kind and quality | | |
|---|---|---|
| | | |
| Category | 2019 RCV | |
| | | |
| Siding | $859,922.12 | |
| Electrical | $35,000.00 | |
| Siding Match | $1,587,654.28 | |
| Electrical repairs necessary for matching | $158,774.00 | |
| GC Match | $0 | |

Siding and electrical subtotal: $894,922.12
Siding Match and Electrical Match subtotal: $1,746,428.28

(*Id.*)

The Award continues on a third page, reproduced in relevant part below:

| Appraisal Award Summary* | | | |
|---|---|---|---|
| | | | |
| | 2019 ACV | 2019 RCV | |
| | | | |
| Sub-Total Claim | $6,756,018.47 | $7,198,113.81 | |
| O & P | $675,601.84 | $719,811.38 | |
| | | | |
| Total Award | $7,431,620.31 | $7,917,925.19 | |

(*Id.* at 3.) Following the table is a certification statement and the three appraisers' signatures. (*Id.*) Finally, below the signatures, the Award includes the starred footnote to which the Appraisal Award Summary table referred:

| *Matching Siding and Electrical: | 2019 RCV | 2019 ACV |
|---|---|---|
| | $1,746,428.28 +10% OH&P | $1,746,428.28 +10% OH&P |
| | $1,921,071.11 | $1,921,071.11 |

(*Id.*)

Two members of the panel, Ms. Bergstrom and Mr. Moe, appended substantially identical advisory statements indicating the percent-increases in construction costs from 2019 to 2020 in Brooklyn Park, Minnesota. (*Id.* at 4–5.) The statements indicated that, according to the Xactimate construction pricing database, costs for various trades rose anywhere from 3% (general conditions) to 18% (siding). (*Id.*)

Mr. Moe sent Mr. Pierce and Mr. Becker an email on April 20 explaining the appended statements:

> At the onset of the appraisal hearing for Maplebrook estates Mr. Jim Pierce presented an award statement proposing that the panel establish an award based on 2019 and 2020 cost pricing. Both appraisers agreed to the format of the award statement presented however Brad Langerman appraiser and Scott Moe umpire agreed that awarding 2020 cost pricing was a coverage question which should not be a part of the award statement. Appraiser Adina Bergstrom did not agree with that and believed it was a valuation issue to be decided. The panel agreed to change the award form by deleting references made to 2020 pricing in the proposed award form and then umpire Scott Moe and appraiser Adina Bergstrom would sign separate statements for the percentage increased from 2019 to 2020 that was presented at the hearing. Scott Moe and Brad Langerman did not believe that the panel had the authority to award amounts related to price increases from 2019 to 2020. Mr. Langerman advised he would not sign the 2019 award if [it] included any 2020 pricing information. Ms. Bergstrom agreed to sign the 2019 Award only if statements for 2020 percentage increase were issued because she did

believe that [the] panel had this authority . . . The appraisal panel unanimously agreed that the statements do not make any decision regarding policy provisions or define policy coverages and that these are coverage questions to be resolved between both sides. Scott Moe and Brad Langerman agree that the 2020 percentage increases are not a part of the 2019 award amounts.

(First Sarp Decl., Ex. R (Appraisal Award and Statements) at 7.)[7]

## I. Additional Payments and Demands for Payment

In addition to the two undisputed ACV payments noted above, by the time of the appraisal hearing Hartford had made the following payments to Maplewood: $82,208.01 in additional undisputed ACV for the repair of the HVAC units; $4,161.09 paid in error; $344,279.01 in recoverable depreciation minus the $4,161.09 paid in error; and $201,744.44 in released depreciation for the HVAC repairs as well as permit fees incurred during the repairs. (*See* Claim Payment Log, First Sarp Decl., Ex. U; First Sarp Decl., Ex. S.) In total, Hartford had paid Maplebrook $6,243,025.32.

After the appraisal panel issued the Appraisal Award, Hartford paid Maplebrook $298,594.99, representing the difference between the Award's total ACV, $7,431,620.31, and the total ACV already paid. (*See* Claim Payment Log; First Sarp Decl., Ex. W.)

On December 13, 2021 Maplebrook's counsel, John Wittmer, submitted an invoice from Capital to Hartford for $11,038,810.89. (First Sarp Decl., Ex. Z (Dec. 13, 2020 Capital Invoice).) Mr. Wittmer explained that "Maplebrook has completed all repairs relating to the damage. . . . Accordingly, Maplebrook is demanding payment of the Replacement Cost

---

[7] The Court refers here to Hartford's award exhibit. Although both parties provided a copy of the Award, only Hartford's exhibit includes Mr. Moe's email.

Value ("RCV") of the Appraisal Award, $11,038,810.89, minus applicable deductible and prior payments." (*Id.* at 2.) He declared that, even taking Hartford's position that the "Total Award" is $7,917,925.19, Hartford owes Maplebrook $486,304.88 in "Payable RCV."[8] (*Id.* at 2–3.) Mr. Wittmer requested payment within 10 business days.

The only line item on the December invoice is "All repairs as outlined in the adjusters summary and appraisal award." (*Id.* at 4.) When asked to explain the basis for the invoice, neither Maplebrook's President, Mr. McLarty, nor its adjuster, Mr. Pierce, could identify the additional post-appraisal repairs to which the invoice corresponded. (McLarty Dep. at 60:6–62:4; Pierce Dep. at 82:3–86:7.) Mr. Pierce testified that "there's nothing outstanding and undisputed, though. So I am assuming all monies have been paid that's owed now." (Pierce Dep. at 85:18–19.) Mr. Muelken, the repair project manager, similarly did not know what the invoice represents, testifying that "This was requested from Gavant so they can have that to submit to the carrier." (Muelken Dep. at 109:9–11.) He disclaimed any involvement with calculating the amount on the invoice and explained that Gavnat came up with the number "based on the scope and appraisal award." (*Id.* at 109:19–25.)

To date, Hartford has refused to issue a payment based on the December 2021 invoice.

---

[8] Mr. Wittmer arrived at this number through the following calculation: $7,917,925.19 (Hartford's valuation of the RCV of the Appraisal Award) - $890,000 (Maplebrook's Policy Deductible) - $6,541,620.31 (Prior payments) = $486,304.88. (*Id.* at 3.)

**J.     Procedural History**

Maplebrook filed suit in Hennepin County District Court on June 9, 2021, alleging breach of contract and seeking a declaratory judgment. (Compl. ¶¶ 35, 42.) Specifically, Maplebrook alleges that Hartford breached the terms of the Policy by paying only $6,243,025.32 for the repairs rather than the total RCV awarded by the appraisal panel, $11,038,810.89. (*Id.* ¶¶ 26, 28, 31–36.) Further, Maplebrook alleges that Hartford has failed to pay all pre-award interest owed. (*Id.* ¶¶ 37–45.) Hartford removed to this Court on June 30, 2021. (Notice of Removal.)

The parties filed cross-motions for summary judgment on May 17, 2023. (*See* Def.'s Summ. J. Mot. [Doc. No. 65]; Pl.'s Summ. J. Mot. [Doc. No. 73].)

Hartford retained Jeffrey A. Nonhof, a Senior Executive General Adjuster at Engle Martin & Associates, to provide an expert opinion about the viability of harvesting. (First Sarp Decl., Ex. M (Nonhof Report).) Mr. Nonhof opined that "harvesting of undamaged siding to facilitate repairs to elevations of similar color and exposure is an acceptable, reasonable, and customary repair practice in the insurance and construction industry." (*Id.* at 3.) He further stated that based on the J.S. Held summaries, "more than enough buildings were designated for replacement to supply the material needed to facilitate repairs on the remaining elevations with similar colors and specific elevations. (*Id.* at 4.) Finally, he opined that, "It was contrary to custom practice in the insurance and construction industry, for the insured to replace all the vinyl siding and discard the original, prior to the Appraisal Hearing." (*Id.*)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of material fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

Both parties move for summary judgment. Hartford first argues that it has already paid the full RCV as required by both the Policy and the Appraisal Award, because the Award assumes harvesting as a method of repair and because Maplebrook's disposal of the original siding breached the "Protect Property" Policy provision. (Def.'s Mem. [Doc. No. 67] at 21–29.) Second, it contends that Maplebrook should be sanctioned under the doctrine of spoliation for destroying the old siding. (*Id.* at 29–30.) Third, Hartford asserts that Maplebrook's demand for payment in the December 2021 invoice is unsupported by evidence of additional repairs. (*Id.* at 30–32.) Fourth, it argues that both the Award and the plain language of the Policy calculate the RCV based on 2019 construction costs, not 2020 construction costs. (*Id.* at 32–35.) Finally, Hartford maintains that it has paid all pre-award interest owed to Maplebrook. (*Id.* at 35–38.)

For its part, Maplebrook first asserts that the appraisal panel determined that a full replacement of the siding was warranted and awarded a total RCV to reflect that. (Pl.'s Mem. at 10–13.) Second, Maplebrook contends that under the Policy, and confirmed in the Award, the RCV should be based on 2020 construction costs. (*Id.* at 13–15.) Third, it insists that it did not breach the Policy by repairing the properties and by not preserving the old siding. (Pl.'s Opp'n [Doc. No. 75] at 11–14.) Fourth, Maplebrook asserts that Hartford misapplies the doctrine of spoliation. (*Id.* at 14–15.) Fifth, Maplebrook maintains that the December 2021 invoice reflects the full RCV as determined by the appraisal panel. (*Id.* at 16–17.) Lastly, Maplebrook contends that Hartford owes additional pre-award interest,

based on the date of notice of the claim, as well as post-award interest from when the repairs were completed. (*Id.* at 20–24.)

Of all these arguments, the Court will only address here the interpretation of the Appraisal Award.

### A.   Appraisal Awards Generally

In the interest of efficiency and avoiding litigation, "there is a strong public policy in Minnesota favoring appraisals." *Quade v. Secura Ins.*, 814 N.W.2d 703, 707 (Minn. 2012). Indeed, as noted above, Minnesota law mandates the inclusion of an appraisal clause in all hail insurance policies. Minn. Stat. § 65A.26 (2023). Courts traditionally looked to the Minnesota Uniform Arbitration Act ("MUAA") when reviewing appraisal awards in insurance disputes. *Herll v. Auto-Owners Ins. Co.*, 879 F.3d 293, 295 (8th Cir. 2018) (citing *QBE Ins. Corp. v. Twin Homes of French Ridge Homeowners Ass'n*, 778 N.W.2d 393, 398 (Minn. Ct. App. 2010), among others).

Recently, the Minnesota Supreme Court definitively held that the MUAA does *not* apply to the appraisal process under the Minnesota Standard Fire Insurance Policy, Minn. Stat. § 65A.01. *Oliver v. State Farm Fire & Cas. Ins. Co.*, 939 N.W.2d 749 (Minn. 2020). Although *Oliver* addressed the timing of requesting pre-award interest for fire insurance claims, nothing in the opinion limits its scope to that particular insurance statute or procedural issue. *See id.*; *see also Savanna Grove Coach Homeowners' Ass'n v. Auto-Owners Ins. Co.*, No. 19-cv-1513 (ECT/TNL), 2023 WL 3397312, at *2–3 (D. Minn. June 19, 2020) (slip copy) (concluding the same). Compounding the difficulty for the district

courts, the Supreme Court did not identify an alternative framework under which the content of appraisal awards should be assessed.[9]

As Judge Tostrud has observed, however, there is reason to believe that the Supreme Court will continue to apply the same principles to appraisal award interpretation. "This is so primarily because arbitration awards and appraisal awards share an important underlying policy—the quick and final resolution of disputes without judicial intervention. And they share standards for setting asides awards." *Cincinnati Ins. Co. v. Rymer Cos., LLC*, No. 19-cv-1025 (ECT/TNL), 2023 WL 4088401, at *3 (D. Minn. June 20, 2023) (slip copy). Following *Oliver*, both Judge Tostrud and Judge Tunheim have applied the traditional rules for interpreting appraisal awards. *See id.* at *3–4; *Fenske v. Integrity Prop. & Cas. Ins. Co.*, No. 22-cv-679 (JRT/DJF), 2023 WL 186595, at *2–4 (D. Minn. Jan. 13, 2023) (slip copy); *see also Blueberry Bowl, LLC v. Midwest Fam. Mut. Ins. Co.*, No. A23-0739, 2023 WL 4043806, at *2 (Minn. Ct. App. June 13, 2023) ("*Oliver* does not suggest that the district court cannot confirm or modify an appraisal award."). For the time being, so too will this Court.

Under those rules, appraisal awards are "attended with every presumption of validity" and "will not be vacated unless it clearly appears that it was the result of fraud . . . or wrongdoing on the part of the appraisers." *Mork v. Eureka-Security Fire & Marine Ins.*

---

[9] In a footnote, the Supreme Court held that the Minnesota Declaratory Judgment Act is an appropriate vehicle for seeking preaward appraisal interest. *Id.* at 754 n.6. Maplebrook pursued that route here. (Compl. ¶¶ 37–45.)

*Co.*, 42 N.W.2d 33, 38 (Minn. 1950). Neither party charges the appraisal panel with such misbehavior.

On the other hand, unlike arbitrations, appraisal panels have more limited authority: they can "decide the 'amount of loss' but may not construe the policy or decide whether the insurer should pay." *Quade*, 814 N.W.2d at 706; *see also Auto-Owners Ins. Co. v. Second Chance Invs., LLC*, 812 N.W.2d 194, 199 (Minn. Ct. App. 2012), *aff'd*, 827 N.W.2d 766 (Minn. 2013) ("[A]ppraisal proceedings and the appraisers' task are distinct from judicial and arbitration proceedings, because appraisers make valuation determinations, but are not empowered to decide questions of law.") (citation omitted). Courts defer to an appraisal panel's factual determination of the amount of loss. *Cedar Bluff Townhome Condo Ass'n v. Am. Fam. Mut. Ins. Co.*, 857 N.W.2d 290, 296 (Minn. 2014).

Such deference does not extend to an ambiguous award. Instead, an ambiguous award requires resubmission of the claim to the panel "to consider whether to modify or correct the award . . . to clarify the award." Minn. Stat. § 572B.20(d)(3) (2023); *see Hilltop Constr., Inc. v. Lou Park Apartments*, 324 N.W.2d 236, 240 (Minn. 1982). "A reviewing court is 'prohibited from ignoring the ambiguity and summarily affirming the award.'" *Herll*, 879 F.3d at 296 (quoting *Menahga Educ. Ass'n v. Menahga Indep. Sch. Dist. No. 821*, 568 N.W.2d 863, 869 (Minn. Ct. App. 1997)). As in other contexts, an appraisal award is ambiguous when it is "reasonably susceptible of more than one interpretation." *Herll*, 879 F.3d at 296 (quoting *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997)).

### B.      Maplebrook's Appraisal Award

The core of this dispute is whether the Award assumes the use of harvesting as a repair method or assumes the installation of all new siding on every building. Again, harvesting refers to saving individual pieces of siding from a building slated for a total siding replacement and then using those individual pieces for spot repairs on buildings with minimal siding damage.

Two foundational principles are not contested. First, the Policy's phrase "comparable material and quality," (Policy at 123), entitles Maplebrook to have the damaged siding replaced with "something less than an identical color match, but a reasonable color match nonetheless." *Cedar Bluff*, 875 N.W.2d at 294. The appraisal panel here thus had full authority to consider the availability of reasonably matching siding. *Id.* at 294–95.

Second, during the pendency of this dispute, the Minnesota Court of Appeals had occasion to address the use of harvesting as a repair technique for hail damage. *Elm Creek Courthome Ass'n v. State Farm Fire & Cas. Co.*, 971 N.W.2d 731 (Minn. Ct. App. 2022).

Like Maplebrook, a hail storm damaged the siding on a number of Elm Creek Courthome Association's ("Elm Creek") residential buildings. *Id.* at 735. When Elm Creek and its insurer could not agree on the amount of loss, Elm Creek requested appraisal. *Id.* The appraisal panel's award stated that "[s]iding was covered on 4 buildings due to match" and that "harvesting from the other 4 buildings" would be performed to repair 10 additional buildings. *Id.* (alteration in original). Elm Creek opposed harvesting and sued, arguing that

by selecting a method of repair, the panel had made a coverage determination and exceeded its authority. *Id.*

The district court awarded summary judgment to the insurer and the Court of Appeals affirmed. *Id.* at 738–39. The Court of Appeals held that "the permissibility of 'harvesting' is not a coverage determination" because the "only dispute is over the cost to repair or replace [the siding]." *Id.* Because the amount of loss "necessarily depends on the means of repair or replacement," appraisal panels may consider the method of repair when formulating their awards. *Id.* at 739. By affirming the award, *Elm Creek* confirms that harvesting is a permissible repair technique for damaged siding.

In this case, the Award is susceptible to multiple reasonable interpretations. The ambiguity arises from four components of the document: (1) the panel's "No" answer in response to the question "[i]s there a Reasonable Matching Replacement Siding of like kind and quality available?", (Award at 2); (2) the inclusion of two separate subtotals for "Siding and Electrical" and "Siding Match and Electrical Match," (*id.*); (3) the asterisk next to "Appraisal Award Summary" and the accompanying footnote for "Matching Siding and Electrical," (*id.* at 3); and (4) the omission of the word "harvesting" from the Award, (*see generally id.*).

Maplebrook harmonizes these components to conclude that the panel rejected harvesting. Its interpretation proceeds as follows: the panel knew that harvesting was an option, as presented by Mr. Pierce and as reflected in Hartford's estimates, and then found no reasonable matching siding available—showing that harvesting could not provide a reasonable match. (Pl.'s Opp'n at 10–11; Pl.'s Reply [Doc. No. 82] at 5–6.) Next, the panel

listed a subtotal for replacing "Siding Match and Electrical Match"; it then demonstrated its intent for that subtotal to be included in the total award by denoting it with an asterisk on the "Appraisal Award Summary." (Pl.'s Mem. at 10–13; Pl.'s Opp'n at 7–11; Pl.'s Reply at 2–7.) At oral argument, Maplebrook asserted for the first time that the $7,917,925.19 listed as the "Total Award" only represents the directly damaged siding.[10] In its view, the true "total" award is the $7,917,925.19 combined with the $1,921,071.11 listed in the "Matching Siding and Electrical" footnote. Lastly, Maplebrook stresses that if the appraisal panel had intended to select harvesting as the repair method, the Award would have explicitly stated so and identified the buildings from which siding would be harvested. (Pl.'s Mem. at 16; Pl.'s Reply at 9–11.)

Hartford reads the Award differently. It interprets the panel's "No" answer to mean that, consistent with ITEL's report, no new samples of the original siding were available from the manufacturer. (Def.'s Opp'n [Doc. No. 77] at 21 n.7; Def.'s Reply [Doc. No. 80] at 2.) Hartford also proposes that the panel may have answered "No" because Maplebrook had destroyed the original siding, preventing its use in harvesting. (Def.'s Mem. at 22.) As for the inclusion of the "Siding Match" subtotal on the second page, and the asterisk on the last page, Hartford believes the panel listed these numbers for informational purposes, similar to its approach with the 2019 and 2020 construction costs. (Def.'s Mem. at 21; Def.'s Opp'n at 21.) Alternatively, Hartford suggests that the panel may have been unsure whether it had the authority to consider harvesting as a method of repair because the Award

---

[10] As neither party requested an official transcript, the Court summarizes this argument.

preceded *Elm Creek*. (Def.'s Mem. at 21–22; Def.'s Opp'n at 21–22.) Hartford notes that the "Total Award"—$7,917,925.19—can only be calculated by adding the "Siding and Electrical subtotal" to the RCV subtotals from the other trades. (Def.'s Reply at 1–2; Def.'s Opp'n at 20–21.) Finally, Hartford points out that "harvesting" is a term of art that even its own estimates, reviewed by the panel, did not use. (Def.'s Mem. at 22; Def.'s Opp'n at 22.)

The Court finds that both interpretations are reasonable. The asterisk referencing the "Matching Siding and Electrical" subtotal, at the top of a table including a "Total Award" which can only be calculated using the "Siding and Electrical" subtotal, creates an irreconcilable ambiguity. (*See* Appraisal Award at 3.) In contrast to the construction pricing issue, the panel did not explain why it provided these two separate numbers. Without such an explanation, the Court (and the parties) are left to speculate about what the "Total Award" represents.

The ambiguity in the Appraisal Award requires its remand to the appraisal panel for clarification. The Court instructs the appraisal panel to address: (1) why they believe there is no "Reasonable Matching Replacement Siding of like kind and quality available"; (2) whether the Award includes the cost of repairing the damaged siding through harvesting or includes the cost of replacing every building with new siding; and (3) whether the "Total Award" is $7,917,925.19 or $9,838,996.30.[11] *See* Minn. Stat. § 572B.20 (2023); *Fenske*, 2023 WL 186595, at *4 (citing Section 572B.20 for the proposition that the Court has "broad authority to instruct the Appraisal Panel to 'modify or correct the award'"). The

---

[11] $7,917,925.19 (Total Award) + $1,921,071.11 (Matching Siding and Electrical) = $9,838,996.30.

Court encourages the appraisal panel to explain its reasoning in detail to avoid further confusion.

As for the remaining contested issues, the Court will reserve ruling on those disputes until the appraisal panel completes its task. In the meantime, this action will be stayed.

## IV.   CONCLUSION

Accordingly, based on the submissions and the entire file and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. The Court **REMANDS** this case back to the appraisal panel for clarification of its views on the availability of matching siding, the use of harvesting as a repair method, and the amount of the Total Award;

2. The parties shall file the appraisal panel's written response with the Court when it is received;

3. The Court **RESERVES** decision on the remaining issues in the parties' Motions [Doc. Nos. 65, 73]; and

4. The Court **STAYS** this action pending the receipt of the appraisal panel's clarification.


Dated: August 7, 2023                                   s/ Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge

28