## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Maplebrook Estates Homeowner's Association, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Hartford Fire Insurance Company, <br><br> Defendant. | Case No. 21-cv-01532 (SRN/DJF) <br><br><br> **MEMORANDUM AND ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT** |

Alexander M. Jadin and David A. Brandis, Smith Jadin Johnson, PLLC, 7900 Xerxes Avenue S., Suite 2020, Bloomington, MN 55431, for Plaintiff.

Jonathan D. Day and Paulette S. Sarp, 250 Nicollet Mall, Suite 1150, Minneapolis, MN 55401, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Hartford Fire Insurance Company's ("Hartford") Motion for Summary Judgment [Doc. No. 65] and Plaintiff Maplebrook Estates Homeowner's Association, Inc.'s ("Maplebrook") Cross Motion for Summary Judgment [Doc. No. 73]. For the following reasons, the Court grants in part and denies in part each party's motion.

## I.    BACKGROUND

### A.    Hailstorm and Insurance Policy

Maplebrook manages a non-profit, common interest residential community in Brooklyn Park, Minnesota. (Notice of Removal [Doc. No. 1], Ex. 1 (Compl.) ¶ 1.) On

1

August 5, 2019, a storm caused hail and wind damage to eighty-nine of Maplebrook's buildings. (*See* Miller Decl. [Doc. No. 68], Ex. 1 (Miller Damage Report); Brandis Decl. [Doc. No. 74], Ex. E (Appraisal Award or the "Award") at 1.) Although various parts of the buildings ultimately needed repair, this dispute concerns the repair of damaged siding.

At the time of the storm, Hartford insured Maplebrook's buildings under a Special Multi-Flex Business Insurance Policy (the "Policy"). (Brandis Decl., Ex. A (Policy) at 5.)[1] The Policy reads, in relevant part, "We will pay for direct physical loss of or direct physical damage to . . . Covered Property caused by or resulting from a Covered Cause of Loss." (*Id.* at 119.) Covered causes of loss include "windstorm or hail." (*Id.* at 107.)

When damaged, Covered Property is subject to "Replacement Cost." (*Id.* at 23.) For such property, the Policy provides:

> [W]e will determine the value of Covered Property at the actual amount spent to repair, replace or rebuild the damaged property as of the time of the loss or damage, at the same site or another site, subject to the following:
> a.  We will not pay more for lost or damaged property than the least of
> (1)  The Limit of Insurance applicable to the lost or damaged property,
> (2)  The amount it costs to replace, on the same premises, the lost or damaged property with other property:
> (a)  Of comparable material and quality; and
> (b)  Used for the same purpose; or
> (3)  The amount you actually spend that is necessary and reasonable to repair or replace the lost or damaged property with other property:
> (a)  Of comparable material and quality; and
> (b)  Used for the same purpose . . . .
> b.  We will pay you on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced.

---

[1] When citing to the Policy, the Court uses the blue docket pagination at the top of the page.

(*Id.* at 121.)

Minnesota law requires all hail insurance policies to provide for an appraisal process. *See* Minn. Stat. § 65A.26 (2023). The Policy thus outlines:

> If [Hartford] and [the insured] disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
> a. Pay its chosen appraiser; and
> b. Bear the other expenses of the appraisal and umpire equally.
> If there is an appraisal, we will still retain our right to deny the claim on the grounds that it is not covered under this policy.

(Policy at 103.)

Finally, the Policy requires Maplebrook to take certain actions when a covered loss occurs. (*See id.* at 106.) Of note here, Maplebrook must "Protect Property":

> Take all reasonable steps to protect the property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim . . . [Hartford] will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(*Id.*)

## B.    Claim Submission

After the hailstorm, Maplebrook initiated the claims process. The record is silent as to how Maplebrook reported its loss, however on September 9, 2019, Hartford acknowledged by email receipt of the claim. (Brandis Decl., Ex. C (Sept. 9, 2019

3

Email).) In the ensuing months, Maplebrook entered into a series of contracts to assess and repair the damage to its buildings.

On September 24, 2019, Maplebrook retained a public adjuster, James Pierce, d/b/a Gavnat and Associates ("Gavnat"), to represent it in the insurance claim process. (First Sarp Decl. [Doc. No. 70], Ex. C (Authorization Agreement).) Under their contract, Mr. Pierce would receive as compensation 10% of the total insurance proceeds paid by Hartford to Maplebrook. (First Sarp Decl., Ex. D (Public Adjuster Contract).)

That same month, Maplebrook hired Capital Construction, LLC ("Capital") as its general contractor to "perform the repair and replacement work specified in [Maplebrook's] insurance company's estimate of repairs." (First Sarp Decl., Ex. E (Construction Contract).) Capital would receive as payment the proceeds from the insurance settlement and pay Gavnat's fee out of those proceeds. (*Id.*; First Sarp Decl., Ex. F (Muelken Dep.) at 25:12–26:2, 40:3–12.)

Finally, in early October 2019, Capital entered into an agreement with New Concepts Management, Maplebrook's property manager at the time, to act as a liaison between Capital and Maplebrook during the construction project. (First Sarp Decl., Ex. G (Project Oversight Contract) at 45; First Sarp Decl., Ex. H (McLarty Dep.) at 17:9–18:4.) Per the contract, New Concepts would receive 1% of the payments made to Capital on behalf of Maplebrook. (Project Oversight Contract at 46; Muelken Dep. at 27:22–31:1.)

For its part, Hartford retained J.S. Held, LLC ("J.S. Held") to determine the nature and extent of the hail damage to Maplebrook's properties. (Miller Decl. ¶¶ 2–3.)

### C.     Loss Estimates and First Undisputed ACV Payment

On October 2, 2019, Mr. Pierce sent Mr. Becker "the initial estimate for the roofs only." (First Sarp Decl., Ex. Y.) He noted that Maplebrook had pulled samples of the siding to send to ITEL, an independent laboratory that identifies construction materials matching those on an existing home. (*Id.*; Muelken Dep. at 6:11, 61:1–62:2.) To obtain the samples for ITEL, Mr. Muelken removed one-foot sections of siding from four or five buildings, corresponding to the colors used across Maplebrook's properties. (Muelken Dep. at 61:19–62:2; Brandis Decl., Ex. G (ITEL Report) (analyzing five samples).) Mr. Muelken did not conduct a close inspection or make a record of the siding's condition when he removed the samples. (Muelken Dep. at 61:1–65:2.)

 ITEL found that four of the five original siding products had been discontinued and were no longer available. (*See* ITEL Report.) It suggested alternative siding replacements "based on closest match to the original color and physical specifications." (*Id.*) These alternatives varied in their degree of similarity to the original siding. (*See id.*)

Also in October, Sean Miller, building consultant and vice president with J.S. Held, and two colleagues inspected Maplebrook's damaged buildings and recorded the number of hail strikes on each elevation. (Miller Damage Report; First Sarp Decl., Ex. K (Hartford Statement of Loss) at 7.) One building displayed as many as forty damaged siding areas, while some buildings had no visible damage. (Miller Damage Report; Muelken Dep. at 86:23–87:2.) Still others sustained a handful of hail strikes. (*See* Miller Damage Report.) Maplebrook does not dispute the overall accuracy of Mr. Miller's report. (*See* Muelken Dep. at 87:6–9; First Sarp Decl., Ex. J (Pierce Dep.) at 78:1–25

(noting that although he found additional hits after Mr. Miller's report, Mr. Pierce had no record of them).)

On December 13, Hartford's adjuster Jay Becker sent Mr. Pierce the insurer's Statement of Loss. (Hartford Statement of Loss at 3.) The Statement, based on J.S. Held's preliminary estimates, assessed the undisputed actual cash value ("ACV")[2] of the claim as $3,442,778.08: the estimated replacement cost value ("RCV") of $6,348,856.46, less $2,016,078.38 in depreciation and Maplebrook's $890,000 deductible. (*Id.* at 5.) Hartford issued a payment of $3,442,778.08 to Maplebrook three days later. (*See* First Sarp Decl., Ex. L (Claim Payment Log) at 1.)

Along with the Statement of Loss, Mr. Becker sent J.S. Held's damage estimate reports for each building. (*See* Hartford Statement of Loss at 6–90.)[3] Under the heading "Scope recap," J.S. Held noted, "The vinyl siding will require some elevation replacement and some spot repairs, or replacement of pieces on other elevations due to the direction of the storm." (*Id.* at 7.) The "General Conditions" estimate included a line-item for "Job-site cargo/storage container" with an explanatory note: "Allowance for on site storage of salvaged siding, and other materials." (*Id.* at 8.) In the individual building estimates, siding-related line items noted, "Remove and replace one piece of siding identified with damage . . . . Material provided by siding removed from other buildings/elevations." (*See, e.g.*, *id.* at 16.)

---

[2] Actual cash value is "generally the cost to repair or replace an item with material of like kind and quality less depreciation or salvage." (First Sarp Decl., Ex. T at 7.)

[3] Hartford's exhibit only includes the "General Conditions" estimate and the estimate for one building as an exemplar. (*See* First Sarp Decl. ¶ 12.)

In his declaration, Mr. Miller explained that J.S. Held's estimates assumed the use of "harvesting" as a siding repair method. (Miller Decl. ¶ 7.) Harvesting, according to Mr. Miller, is a common, accepted technique: undamaged siding panels from buildings slated for full siding replacement are used to make color-matched spot repairs on buildings that sustained only minimal siding damage. (*Id.* ¶ 5.) Mr. Miller determined that the Maplebrook homes slated for full re-siding would provide "sufficient amounts of undamaged siding in all (4) colors that could have been harvested and used for insert repairs" in the homes with less damage. (*Id.* ¶ 8.) He opined that the panels to be harvested were in a sufficient condition to maintain their structural integrity during the process. (*Id.* ¶ 11.)

Several months later, in May 2020, Mr. Pierce sent Mr. Becker the loss statement prepared by Gavnat. (First Sarp Decl., Ex. N (Gavnat Statement of Loss) at 2.)[4] Regarding siding, Mr. Pierce wrote, "Your expert enlisted 'harvesting' into his bid[.] MapleBrook [sic] is claiming full siding replacement due to matching and not accepting using used products on their homes." (*Id.*) Like Mr. Muelken, Mr. Pierce never inspected the siding's condition to determine its suitability for harvesting. (Pierce Dep. at 77:1–18.)

### D.    Homeowners' Input and Maplebrook's Decision

At some point, Maplebrook's homeowners learned of Hartford's proposal to perform harvesting and it became a point of contention in the community. (*See* First Sarp Decl., Ex. H (McLarty Dep.) at 55:19–56:1.) On June 12, 2020, Maplebrook's then-

---

[4] The record does not contain Gavnat's overall loss estimate. The exhibit includes the email from Mr. Pierce, the estimate for the "General Conditions," and the estimate for one set of buildings as an exemplar. (*See* Gavnat Statement of Loss.)

President, Dan Couture, sent a letter to homeowners. (First Sarp Decl., Ex. P (Couture Letter).) First, he shared that a special assessment vote had failed to receive the necessary two-thirds majority, but that 61% of homeowners had voted in favor. (*Id.* at 1.) He then continued:

> The message from these homeowners was clear: they didn't want their home repaired with re-used siding and told to wait more than a decade to receive the new siding their neighbor will get this year. The Board didn't like that option either—not with half our residents expected to sell their homes in the next 10 years. Acknowledging the wishes of this majority of voters, the Board consulted with our repair project partners to devise an alternative plan which delivers most of our original proposal—without the aid of a Special Assessment.
>
> **The Board is pleased to announce that EVERY building at Maplebrook will receive new roofs, siding and trim this year.** No harvested siding will be used. . . .
>
> We are enthusiastic about the potential transformation this project presents for our nearly 40-year old community. The Board adopted this revised plan for three major reasons:
>
> - Although the Special Assessment did not pass, the large majority of YES voters warranted the Board depart from the 'fix only what insurance will cover' option.
> - Maplebrook will save hundreds of thousands of dollars making these improvements now at Hartford insurance-negotiated contractor prices over replacement in 10+ years. . . .
> - All homeowners will receive the same exterior improvements as their neighbors—no one is left out. Everyone benefits from the improved curb appeal and price appreciation at resale provided by a significantly refreshed exterior.

(*Id.* (emphasis in original).)

The work would be funded, the letter explained, entirely through insurance proceeds and Maplebrook's reserve funds—rather than through a special assessment on the community. (*Id.*) Mr. Couture finally noted that depending on Maplebrook's pending

negotiation over an additional $2 million in siding damages, some additional work that had been eliminated could be reconsidered. (*Id.* at 2.)

### E.   Second Undisputed ACV Payment

On September 28, 2020, Mr. Becker, on behalf of Hartford, emailed Mr. Pierce with an updated Statement of Loss. (First Sarp Decl., Ex. T (Sept. 2020 Hartford Statement of Loss).) He explained that Hartford would be making a payment to Maplebrook of $2,167,824.68, reflecting $467,365.47 in additional undisputed ACV and the release of $1,700,459.21 in applicable depreciation. (*Id.* at 2.) In the attached formal letter, Mr. Becker noted:

> Please be advised that as there remains a stark variance between our updated proposed settlement and your revised settlement demand, we respectfully reject your updated estimate at this time, however, our investigation is continuing in an effort to validate additional damage amounts.
> As our investigation is continues [sic], we request that any damaged property that has not yet been agreed to or accepted be left as is, if feasible, to ensure additional inspections of the damages can continue to occur, if necessary, in hopes of resolving this amicably.

(*Id.* at 5.) The payment was issued on September 28. (Claim Payment Log at 3.)

### F.   Repairs

The siding repairs proceeded swiftly.[5] According to Mr. Muelken, eighty-eight of Maplebrook's homes had been completely re-sided with new materials by October 2020, out of a total of 89 homes subject to repair.[6] (Muelken Dep. at 55:4–10.) None of the

---

[5] The record does not identify when construction began.

[6] In addition to replacing all of the siding, Maplebrook elected to install fan-fold insulation beneath it to improve insulation. (Muelken Dep. at 31:5–32:18.) Maplebrook

existing siding was saved after removal from the buildings and Capital did not notify Hartford before its disposal. (*Id.* at 61:13–17, 66:5–8, 67:23–68:6; Pierce Dep. at 45:10–14.)

> Mr. Muelken testified that Capital disposed of the old siding for two reasons:
>
> One, it's not common practice for us to store, save or try and salvage old siding. Two . . . due to the age, condition of the existing siding, taking the siding off was near impossible without damaging [it] . . . [S]o the condition of the siding of what was there was not able to be, A, salvaged and not damaged, and because of its age did not match other buildings. The association, because of those factors, before appraisal, decided to pay out of pocket to have uniform appearance for all the buildings because of those factors.

(Muelken Dep. at 57:23–58:14.) However, Mr. Muelken subsequently testified that, on a case-by-case basis, it is possible to methodically salvage siding for spot repairs at a greater labor cost. (*Id.* at 59:4–60:8, 65:3–66:4.) As noted above, Mr. Muelken did not inspect the condition of the siding on each damaged building to assess the feasibility of harvesting. (*Id.* at 61:1–65:2, 66:4.)

Mr. Pierce confirmed that, at the time of the siding's removal, he knew Hartford wanted to perform harvesting. (Pierce Dep. at 46:14–16, 49:6 ("Both Hartford and I were aware that there was a dispute.").) He testified that he believed Maplebrook had no responsibility to store old siding after its removal, and that "if [Hartford] wanted it, they should have taken it." (*Id.* at 46:19–25.) Although he "made Hartford aware that the siding was being replaced on multiple occasions," Mr. Pierce testified that he did not

---

paid directly for the insulation upgrade as a "betterment" and does not request reimbursement for it from Hartford. (*Id.*) Maplebrook directly paid for a number of other betterments, such as to gutters and certain light fixtures, that were completed during the repairs. (*Id.* at 32:22–35:6.)

inform Hartford that the old siding would be thrown away. (*Id.* at 47:6–21.) Mr. Pierce further testified that Maplebrook did not conserve any samples of the old siding despite the likelihood of an appraisal because "[w]e didn't need it for our presentation." (*Id.* at 50:9–10.)

Like its commencement, the record does not reveal when construction was completed on all repairs. Nonetheless, Mr. Muelken testified that all construction suppliers and subcontractors had been fully paid for their work by the end of 2020. (Muelken Dep. at 73:19–24.)

### G.    Amount of Loss Dispute and Appraisal Hearing

On November 13, 2020, Mr. Pierce wrote to Hartford requesting an appraisal, as provided for in the Policy, because the amount of loss remained in dispute. (Brandis Decl., Ex. D (Nov. 13, 2020).) Maplebrook, through Mr. Pierce, named Adina Bergstrom as its chosen member of the three-person appraisal panel. (*Id.*) Brad Langerman, Hartford's appraiser, and Scott Moe, umpire, were the other panelists. (Appraisal Award at 2.)

The appraisal panel met in April 2021. (Appraisal Award at 3.) Mr. Pierce represented Maplebrook at the meeting, while Hartford did not send a representative. (Pierce Dep. at 61:12–14.) Aside from Mr. Pierce's deposition testimony, there is no record of the appraisal panel's proceedings.

Mr. Pierce testified that he raised two areas of dispute to the panel. (*Id.* at 61:20– 62:6.) The first related to siding repairs: Hartford's position, as related by Mr. Pierce, was that harvesting was the proper repair technique, while Maplebrook sought full

replacement of each building's siding. (*Id.* at 61:23–62:3.) Because the siding panels had been discarded during the repairs, the appraisal panel did not have the opportunity to examine any samples. (*See, e.g.*, *id.* at 50:3–10.) The second dispute related to the difference in construction costs between 2019, when the damage occurred, and 2020, when the repairs were made. (*Id.* at 62:7–10.) In addition to presenting this information, Mr. Pierce also submitted to the panel a proposed award form. (*Id.* at 68:15–23.)

The proposed award form included tables with rows labeled with construction trades (e.g., siding or electrical) and columns labeled "2019 RCV" and "2020 RCV." (First Sarp Decl., Ex. Q (Proposed Award).) According to Mr. Pierce, the panel asked why the proposed award form called for two years of cost values. (Pierce Dep. at 69:18–20.) He responded that he had anticipated a coverage dispute over whether 2019 or 2020 construction costs applied, and he "wanted [the panel] to be the fact finder." (*Id.* at 69:21–25.)

## H.     Appraisal Panel's Award

The appraisal panel issued its award (the "Award") on April 20, 2021. (Appraisal Award at 3.) The panel largely adopted the format of the proposed award form, however the final document omitted the 2020 RCV columns that Mr. Pierce had included as an alternative. (*Compare* Proposed Award *with* Appraisal Award.)

The first page bears a table containing award amounts for ten construction trades:

| Award (ACV = Actual Cash Value & RCV = Replacement Cost Value) | | | |
|---|---|---|---|
| Category | 2019 ACV | 2019 RCV | |
| | | | |
| General Conditions | | $173,538.40 | |
| Roofing | | $3,788,283,65 [sic] | |
| Gutters | | $151,919.39 | |
| Soft Metals | | $637,594.19 | |
| Windows | | $267,197.49 | |
| Garage Doors | | $55,436.42 | |
| Chimney Caps | | $286,000.00 | |
| Deck Painting | $83,658.00 | $167,300.00 | |
| HVAC | $358,437.34 | $716,874.68 | |
| Permit | | $59,047.47 | |

(Appraisal Award at 1.)

The second page begins with a question taken from Mr. Pierce's proposed award form: "Is there a Reasonable Matching Replacement Siding of like kind and quality available? Please Check One Column and Sign." (*Id.* at 2.) One appraiser, Mr. Langerman, checked "Yes"; Ms. Bergstrom and Mr. Moe checked "No." (*Id.*) Below that question were instructions: if a majority of the panel checked "Yes," they were to proceed to Option 1; if a majority checked "No," they were to proceed to Option 2. (*Id.*) The rest of the second page is reproduced below:

| Option 1 – There is a reasonable siding of like kind and quality | | |
|---|---|---|
| Category | 2019 RCV | |
| | | |
| Siding | N/A | |
| Electrical | N/A | |

| Option 2 – There is not a proposed reasonable siding of like kind and quality | | |
|---|---|---|
| | | |
| Category | 2019 RCV | |
| | | |
| Siding | $859,922.12 | |
| Electrical | $35,000.00 | |
| Siding Match | $1,587,654.28 | |
| Electrical repairs necessary for matching | $158,774.00 | |
| GC Match | $0 | |

Siding and electrical subtotal: $894,922.12
Siding Match and Electrical Match subtotal: $1,746,428.28

(*Id.*)

The Award continues on a third page, reproduced in relevant part below:

| Appraisal Award Summary* | | | |
|---|---|---|---|
| | | | |
| | 2019 ACV | 2019 RCV | |
| | | | |
| Sub-Total Claim | $6,756,018.47 | $7,198,113.81 | |
| O & P | $675,601.84 | $719,811.38 | |
| | | | |
| Total Award | $7,431,620.31 | $7,917,925.19 | |

(*Id.* at 3.) Following the table is a certification statement and the three appraisers'
signatures. (*Id.*) Finally, below the signatures, the Award includes the starred footnote to
which the Appraisal Award Summary table referred:

| *Matching Siding and Electrical: | 2019 RCV | 2019 ACV |
|---|---|---|
| | $1,746,428.28 +10% OH&P | $1,746,428.28 +10% OH&P |
| | $1,921,071.11 | $1,921,071.11 |

(*Id.*)

Two members of the panel, Ms. Bergstrom and Mr. Moe, appended substantially identical advisory statements indicating the percent-increases in construction costs from 2019 to 2020 in Brooklyn Park, Minnesota. (*Id.* at 4–5.) The statements indicated that, according to the Xactimate construction pricing database, costs for various trades rose anywhere from 3% (general conditions) to 18% (siding). (*Id.*)

Mr. Moe sent Mr. Pierce and Mr. Becker an email on April 20 explaining the appended statements:

> At the onset of the appraisal hearing for Maplebrook estates Mr. Jim Pierce presented an award statement proposing that the panel establish an award based on 2019 and 2020 cost pricing. Both appraisers agreed to the format of the award statement presented however Brad Langerman appraiser and Scott Moe umpire agreed that awarding 2020 cost pricing was a coverage question which should not be a part of the award statement. Appraiser Adina Bergstrom did not agree with that and believed it was a valuation issue to be decided. The panel agreed to change the award form by deleting references made to 2020 pricing in the proposed award form and then umpire Scott Moe and appraiser Adina Bergstrom would sign separate statements for the percentage increased from 2019 to 2020 that was presented at the hearing. Scott Moe and Brad Langerman did not believe that the panel had the authority to award amounts related to price increases from 2019 to 2020. Mr. Langerman advised he would not sign the 2019 award if [it] included any 2020 pricing information. Ms. Bergstrom agreed to sign the 2019 Award only if statements for 2020 percentage increase were issued because she did believe that [the] panel had this authority . . . The appraisal panel unanimously agreed that the statements do not make any decision regarding policy provisions or define policy coverages and that these are coverage questions to be resolved between both sides. Scott Moe and Brad Langerman agree that the 2020 percentage increases are not a part of the 2019 award amounts.

(First Sarp Decl., Ex. R (Appraisal Award and Statements) at 7.)[7]

## I.    Additional Payments and Demands for Payment

In addition to the two undisputed ACV payments noted above, by the time of the appraisal hearing Hartford had made the following payments to Maplewood: $82,208.01 in additional undisputed ACV for the repair of the HVAC units; $4,161.09 paid in error; $344,279.01 in recoverable depreciation minus the $4,161.09 paid in error; and $201,744.44 in released depreciation for the HVAC repairs as well as permit fees incurred during the repairs. (*See* Claim Payment Log, First Sarp Decl., Ex. U; First Sarp Decl., Ex. S.) In total, prior to the appraisal hearing, Hartford had paid Maplebrook $6,243,025.32.

After the appraisal panel issued the Appraisal Award, Hartford paid Maplebrook $298,594.99, representing the difference between the Award's total ACV, $7,431,620.31, and the total ACV already paid. (*See* Claim Payment Log; First Sarp Decl., Ex. W.)

On December 13, 2021, Maplebrook's counsel, John Wittmer, submitted an invoice from Capital to Hartford for $11,038,810.89. (First Sarp Decl., Ex. Z (Dec. 13, 2020 Capital Invoice).) Mr. Wittmer explained that "Maplebrook has completed all repairs relating to the damage. . . . Accordingly, Maplebrook is demanding payment of the Replacement Cost Value ("RCV") of the Appraisal Award, $11,038,810.89, minus applicable deductible and prior payments." (*Id.* at 2.) He declared that, even taking Hartford's position that the "Total Award" is $7,917,925.19, Hartford owes Maplebrook

---

[7] The Court refers here to Hartford's award exhibit. Although both parties provided a copy of the Award, only Hartford's exhibit includes Mr. Moe's email.

$486,304.88 in "Payable RCV."[8] (*Id.* at 2–3.) Mr. Wittmer requested payment within 10 business days.

The only line item on the December invoice is "All repairs as outlined in the adjusters summary and appraisal award." (*Id.* at 4.) When asked to explain the basis for the invoice, neither Maplebrook's President, Mr. McLarty, nor its adjuster, Mr. Pierce, could identify the additional post-appraisal repairs to which the invoice corresponded. (McLarty Dep. at 60:6–62:4; Pierce Dep. at 82:3–86:7.) Mr. Pierce testified that "there's nothing outstanding and undisputed, though. So I am assuming all monies have been paid that's owed now." (Pierce Dep. at 85:18–19.) Mr. Muelken, the repair project manager, similarly did not know what the invoice represents, testifying that "This was requested from Gavant so they can have that to submit to the carrier." (Muelken Dep. at 109:9–11.) He disclaimed any involvement with calculating the amount on the invoice and explained that Gavnat came up with the number "based on the scope and appraisal award." (*Id.* at 109:19–25.)

In 2022, as part of this litigation, Hartford retained Jeffrey A. Nonhof, a Senior Executive General Adjuster at Engle Martin & Associates, to provide an expert opinion about the viability of harvesting. (First Sarp Decl., Ex. M (Nonhof Report).) In his report, delivered on December 16, 2022, Mr. Nonhof opined that "harvesting of undamaged siding to facilitate repairs to elevations of similar color and exposure is an acceptable,

---

[8] Mr. Wittmer arrived at this number through the following calculation: $7,917,925.19 (Hartford's valuation of the RCV of the Appraisal Award) - $890,000 (Maplebrook's Policy Deductible) - $6,541,620.31 (Prior payments) = $486,304.88. (*Id.* at 3.)

reasonable, and customary repair practice in the insurance and construction industry." (*Id.* at 3.) He further stated that based on the J.S. Held summaries, "more than enough buildings were designated for replacement to supply the material needed to facilitate repairs on the remaining elevations with similar colors and specific elevations. (*Id.* at 4.) Finally, he opined that, "It was contrary to custom practice in the insurance and construction industry, for the insured to replace all the vinyl siding and discard the original, prior to the Appraisal Hearing." (*Id.*)

To date, Hartford has refused to issue a payment based on the December 2021 invoice.

### J.    Remand To Appraisal Panel And Panel's Clarification

On August 7, 2023, this Court remanded this matter to the appraisal panel, seeking clarification of the panel's decision. *Maplebrook Estates Homeowner's Ass'n, Inc. v. Hartford Fire Ins. Co.*, Case No. 21-cv-01532 (SRN/DJF), 2023 WL 5021164 (D. Minn. Aug. 7, 2023). On November 22, 2023, counsel for Maplebrook submitted a letter to the Court including a copy of the panel's response. (*See* Clarification Ltr. [Doc. No. 88].) The panel answered the questions as follows:

> [Question] 1. "Why do you believe there is no Reasonable Matching Replacement Siding of the like kind and quality available?"
>
> > <u>Answer</u>: There were no documents, samples, or witnesses presented at the appraisal hearing related to the availability of reasonable matching siding
>
> [Question] 2. "Whether the award includes the cost of repairing the damaged siding by the method of harvesting or does it include replacing siding with new siding on every building?"

> Answer: The Appraisal Award Summary includes replacing the hail damaged sides of siding only. The amounts awarded for matching were included in the * portion of the award below the panel's signatures.

[Question] 3. Whether the Total Award is $7,917,925.19 or $9,838,966.30?

> Answer: The RCV award for direct hail damage is an ACV of $7,431,620.31 and an RCV of $7, 917,925.19. The value of matching siding and related electrical repair is $1,921,071,11 for replacing the elevations of siding without hail hits to obtain a reasonably matching appearance. The panel made no determination on whether the policy covered matching and separated out the number so the parties could interface the policy coverage with the award. The totals for hail hit damage and matching are an ACV of $9,352,691.42 and an RCV of $9,838,966.30

(Clarification Ltr. at 2.)

## K. Procedural History

Maplebrook filed suit in Hennepin County District Court on June 9, 2021, alleging breach of contract and seeking a declaratory judgment. (Compl. ¶¶ 35, 42.) Specifically, Maplebrook alleges that Hartford breached the terms of the Policy by paying only $6,243,025.32 for the repairs rather than the total RCV awarded by the appraisal panel, $11,038,810.89. (*Id.* ¶¶ 26, 28, 31–36.) Further, Maplebrook alleges that Hartford has failed to pay all pre-award interest owed. (*Id.* ¶¶ 37–45.) Hartford removed to this Court on June 30, 2021. (Notice of Removal.)

The parties filed cross-motions for summary judgment on May 17, 2023. (*See* Def.'s Summ. J. Mot. [Doc. No. 65]; Pl.'s Summ. J. Mot. [Doc. No. 73].) Following the appraisal panel's clarification and the parties' supplemental briefing, the Court now rules on these motions.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of material fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 252 ("[The] mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### III.    DISCUSSION

Both parties move for summary judgment. Hartford first argues that it has already paid the full RCV as required by both the Policy and the Award, because the Award assumes harvesting as a method of repair and because Maplebrook's disposal of the original siding breached the "Protect Property" Policy provision. (Def.'s Mem. [Doc. No. 67] at 21–29.) Second, it contends that Maplebrook should be sanctioned under the doctrine of spoliation for destroying the old siding. (*Id.* at 29–30.) Third, Hartford asserts that Maplebrook's demand for payment in the December 2021 invoice is unsupported by evidence of additional repairs. (*Id.* at 30–32.) Fourth, it argues that both the Award and the plain language of the Policy calculate the RCV based on 2019 construction costs, not 2020 construction costs. (*Id.* at 32–35.) Finally, Hartford maintains that it has paid all pre-award interest owed to Maplebrook. (*Id.* at 35–38.)

For its part, Maplebrook first asserts that the appraisal panel determined that a full replacement of the siding was warranted and awarded a total RCV to reflect that. (Pl.'s Mem. at 10–13.) Second, Maplebrook contends that under the Policy, and confirmed in the Award, the RCV should be based on 2020 construction costs. (*Id.* at 13–15.) Third, it insists that it did not breach the Policy by repairing the properties and by not preserving the old siding. (Pl.'s Opp'n [Doc. No. 75] at 11–14.) Fourth, Maplebrook asserts that Hartford misapplies the doctrine of spoliation. (*Id.* at 14–15.) Fifth, Maplebrook maintains that the December 2021 invoice reflects the full RCV as determined by the appraisal panel. (*Id.* at 16–17.) Lastly, Maplebrook contends that Hartford owes

additional pre-award interest, based on the date of notice of the claim, as well as post-award interest from when the repairs were completed. (*Id.* at 20–24.)

The Court finds that, with its clarification, the appraisal panel decided that on the facts presented to it, there was no reasonable matching replacement siding, including harvested siding. The appraisal panel, however, did not rule on whether the Policy covered new siding, and the Court now holds that in the absence of a reasonable matching replacement, the Policy covers full replacement of the siding with new matching siding. Similarly, Hartford's arguments that Maplebrook's destruction of the removed siding violated the Policy or constituted sanctionable spoliation of evidence are unavailing. Concerning construction costs, the Court holds that the Policy is clear, and the RCV should be based on 2019 rather than 2020 construction costs. Concerning interest, the Court holds that the accumulation of pre-Award interest should be measured from October 2, 2019 with offsets for prior payments by Hartford, and post-Award interest has accrued. Finally, concerning Maplebrook's December 13, 2021 invoice, the Court holds that the evidence of record is insufficient as a matter of law to prove Maplebrook's expenditures.

### A.    Whether New Matching Siding Is Provided For By The Award

Maplebrook reads the clarified Award to includes payment for matching siding for a total of $9,838,996.30. Maplebrook argues that the appraisal panel reviewed the materials provided to them at the parties' hearing and did not find anything that constituted a reasonable match, and agreed that new siding panels were needed to present a reasonably uniform appearance for Maplebrook's homes. (Pl's Supp. Br. [Doc. No. 91]

at 3-6.) According to Maplebrook, the appraisal panel "only separated the numbers in case there was a dispute over [the Policy's] coverage of the matching portion of the award amount[,]" which is a matter under the jurisdiction of the Court. (*Id.* at 6.)

Hartford reads the clarified Award to "establish[] that because [the appraisal panel] was presented with no evidence 'related to the availability of reasonable matching siding'[,]" the panel did not rule on whether the expense of new siding was covered. (Def's Supp. Br. [Doc. No. 93] at 2.) Hartford argues that "[i]t is undisputed that there would have been a sufficient amount of harvested siding to make spot repairs to those buildings that sustained minor direct hail damage[,]" but because Maplebrook destroyed said siding, the appraisal panel "had no choice but to include the cost of replacing the siding/electrical on all buildings[.]" (*Id.* at 3; Def's Supp. Reply Br. [Doc. No. 94] at 1-2.) As such, the Policy does not cover this expenditure.

### 1. Findings Of The Appraisal Panel As To Replacement Siding

In the interest of efficiency and avoiding litigation, "there is a strong public policy in Minnesota favoring appraisals." *Quade v. Secura Ins.*, 814 N.W.2d 703, 707 (Minn. 2012). Courts traditionally looked to the Minnesota Uniform Arbitration Act ("MUAA") when reviewing appraisal awards in insurance disputes. *Herll v. Auto-Owners Ins. Co.*, 879 F.3d 293, 295 (8th Cir. 2018) (citing *QBE Ins. Corp. v. Twin Homes of French Ridge Homeowners Ass'n*, 778 N.W.2d 393, 398 (Minn. Ct. App. 2010), among others).[9]

---

[9] While, as noted in this Court's prior decision, recent case law has called this practice into question, *Oliver v. State Farm Fire & Cas. Ins. Co.*, 939 N.W.2d 749 (Minn. 2020), the Court will follow the rulings of other judges within the district and continue to

Under MUAA's principles, appraisal awards are "attended with every presumption of validity" and "will not be vacated unless it clearly appears that it was the result of fraud . . . or wrongdoing on the part of the appraisers." *Mork v. Eureka-Security Fire & Marine Ins. Co.*, 42 N.W.2d 33, 38 (Minn. 1950). However, appraisal panels have more limited authority than arbitrators: they can "decide the 'amount of loss' but may not construe the policy or decide whether the insurer should pay." *Quade*, 814 N.W.2d at 706; *see also Auto-Owners Ins. Co. v. Second Chance Invs., LLC*, 812 N.W.2d 194, 199 (Minn. Ct. App. 2012), *aff'd*, 827 N.W.2d 766 (Minn. 2013) ("[A]ppraisal proceedings and the appraisers' task are distinct from judicial and arbitration proceedings, because appraisers make valuation determinations, but are not empowered to decide questions of law.") (citation omitted). Courts defer to an appraisal panel's factual determination of the amount of loss, but questions of liability are always reserved for the court. *See Cedar Bluff Townhome Condo Ass'n v. Am. Fam. Mut. Ins. Co.*, 857 N.W.2d 290, 296 (Minn. 2014).

The appraisal panel's clarification letter allows the Court to resolve any ambiguity in the original Award. In response to the Court's first question. the panel stated that "[t]here were no documents, samples, or witnesses presented at the appraisal hearing related to the availability of reasonable matching siding." (Clarification Ltr. at 2.) The best reading of the appraisal panel's clarification is that the panel concluded that there was not reasonable matching siding of like kind and quality as a factual matter. Per the

apply MUAA's principles to appraisal award interpretation. *Maplebrook Estates Homeowner's Ass'n*, 2023 WL 5021164 at *10 (internal citations omitted).

well-established division of responsibilities between appraiser and court under Minnesota law, in the absence of allegations of fraud, misfeasance, malfeasance, or wrongdoing on the part of the appraisers (none of which are present in the instant case), this is a final and conclusive finding of fact. *See Mork*, 42 N.W.2d at 38. Hartford had the opportunity to present evidence that if removed siding had been preserved, it could have been "harvested" for use, *see generally* Miller Decl., to the appraisal panel. However, Hartford opted not to attend the appraisal panel's proceedings. The appraisal panel was Hartford's opportunity to be heard. To allow Hartford a second opportunity to present evidence, in the absence of any allegation that it was denied due process in the first instance[10] or that the appraisal panel committed misconduct, would undermine the purpose of the appraisal process and conflict with well-established law.

Rather, the sole question before the Court is whether, given the lack of any reasonable matching siding—whether obtained through harvesting or purchasing new siding for some buildings—the Policy covers full replacement with new siding. As stated by the appraisal panel in its answer to the third question posed by the Court, "[t]he panel made no determination on whether the policy covered matching and separated out the number[s] so the parties could interface the policy coverage with the award."

---

[10] Even if Hartford asserted such a claim, it would be unlikely to succeed, as there is no evidence that its voluntary non-attendance at the appraisal panel hearing violates due process. *See Rose Hill Villas Owners Association, Inc. v. American Family Mutual Insurance Company*, Case No. 20-cv-2191 (ECW), 2021 WL 5235070 at *10 (D. Minn. Nov. 10, 2021) ("Because [plaintiff] had notice of [defendant's] argument[,] had the opportunity to present evidence to the contrary at the appraisal, and did not do so, [plaintiff] has not met its burden to vacate the appraisal due to a due process violation.")

(Clarification Ltr. at 2.) This is a question of coverage, and therefore the Court must determine its answer based on the Policy.

### 2. Policy Coverage As To New Replacement Siding

Interpretation of an insurance contract, including whether provisions in a policy are ambiguous, is a legal question for the courts. *See Oakdale Mall Associates v. Cincinnati Ins. Co.*, 702 F.3d 1119, 1122 (8th Cir. 2013); *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008) ("General principles of contract interpretation apply to insurance policies.") When interpreting an insurance contract, the federal court looks to state law. *See W3i Mobile, LLC v. Westchester Fire Ins. Co.*, 632 F.3d 432, 436 (8th Cir. 2011).

"When interpreting insurance contracts, the policy must be construed as a whole, beginning with the plain and ordinary meaning of the policy's terms, as well as 'what a reasonable person in the position of the insured would have understood the words to mean.'" *Cedar Bluff Townhome Condo Ass'n v. American Family Mut. Ins. Co.*, 857 N.W.2d 290, 294 (Minn. 2014) (citing *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013)). If policy language is ambiguous, it must be interpreted in favor of coverage. *Wanzek Const., Inc. v. Employers Ins. of Wausau*, 679 N.W.2d 322, 325 (Minn. 2004). However, insurance policy provisions are ambiguous only when they are reasonably subject to more than one interpretation, and the court has no right to read an ambiguity into the plain language of an insurance policy. *Oakdale Mall*, 702 F.3d at 1122.

The plain language of the Policy provides that Hartford:

a. "will not pay more for lost or damaged property than the least of:

    (1) The Limit of Insurance applicable to the lost or damaged property,

    (2) The amount it costs to replace, on the same premises, the lost or damaged property with other property (a) of comparable material and quality and (b) used for the same purpose; or

    (3) The amount you actually spend that is necessary and reasonable to repair or replace the lost or damaged property with other property (a) of comparable material and quality and (b) used for the same purpose

(Brandis Decl., Ex. A (Policy) at 123) (cleaned up).

The Policy's language is not ambiguous: it covers replacement of lost or damaged property with other property of "comparable material and quality." The appraisal panel found that there was no proposed reasonable siding of "like kind and quality[,]" a functionally synonymous phrase to "comparable material and quality."

The Supreme Court of Minnesota considered a near-identical set of facts in *Cedar Bluff Townhome Condo Ass'n*. There, a hailstorm damaged the siding on the plaintiff's buildings, but replacement panels with the same specifications were not available in the same color as existing panels. 857 N.W.2d at 291-92. The court held that the "appraisal panel properly concluded that siding of comparable material and quality required a reasonable color match between the damaged and undamaged siding[,]" as "comparable" quality requires a reasonably close (if not identical) color match. *Id.* at 291, 294. The court deferred to the appraisal panel's determination that this necessitated the replacement of both damaged and undamaged siding to ensure a uniform level of quality and color match. *Id.* at 295-96.

Hartford's response is unavailing. Hartford cites to *Elm Creek Courthome Ass'n v. State Farm Fire & Cas. Co.*, which held that an appraisal panel could reasonably find that harvested siding met a contractual requirement that lost property be replaced with property of "comparable material, quality and used for the same purpose." 971 N.W.2d 731, 737-38 (Minn. App. 2022). However, while *Elm Creek* established that harvesting *can* meet this standard as a general matter, it does not *require* appraisal panels to find that harvested siding is of comparable material and quality. Rather, the *Elm Creek* court found that the appraisal panel was "*within its authority to consider* 'harvesting' in the context of determining [the cost of replacement.]" *Id*. at 739 (emphasis added).

Here, as discussed, the appraisal panel found that there was no reasonable replacement siding, harvested or not. The Court defers to the appraisal panel's finding, and finds that according to the Policy, Hartford is required to pay for full replacement of all siding. As such, the Court grants Maplebrook's motion for summary judgment and denies Hartford's motion for summary judgment on this basis.

### B.  Maplebrook's Alleged Violation Of The Policy

Hartford argues that, based on Mr. Miller's report, had Maplebrook stored the siding removed from its buildings, as Hartford anticipated and included in its cost estimates, there would have been enough harvested material to repair buildings that suffered minimal damage. (Def's Summ. J. Br. [Doc. No. 67] at 25.) However, because Maplebrook instead disposed of the removed siding, it violated the Policy's requirement that Maplebrook "[t]ake all reasonable steps to protect the property from further damage" and "set the damaged property aside and in the best possible order for examination."

(Def's Summ. J. Br. at 25-27 (citing Policy at 106).) Hartford argues that this meets the Policy's exclusion of not paying for loss or damage resulting from "[n]eglect to use all reasonable means to save and preserve property from further damage at and after time of the direct physical loss or damage." (Def's Summ. J. Br. at 25-27 (citing Policy at 137).) As such, Hartford is not required to pay for damages resulting from Maplebrook's destruction of the siding, *i.e.*, the increase in cost relating to the need to replace all of the buildings' siding and related electrical work.

Maplebrook argues that it has not violated the Policy, as it was not required to keep damaged siding in place or preserve the damaged siding under the terms of the Policy. Maplebrook argues that "there [was] no way that samples would have proven that harvesting was appropriate[,]" that Hartford had "ample warning that the repairs would be done and never told Maplebrook to keep samples[,]" and even if Maplebrook's actions breached the agreement, the breach was not material, as "there was no matching siding available on the open market when [Hartford] relied instead on harvesting [and] Hartford chose not to attend the appraisal, so it was not deprived of the opportunity to present samples to the appraisal panel." (Pl's Summ. J. Reply Br. [Doc. No. 82] at 10-14.)

"Exclusions in an [insurance] policy…are as much a part of the contract as other parts thereof and must be given the same consideration in determining what the policy covers." *Bobich v. Oja*, 104 N.W.2d 19, 24-25 (Minn. 1960). Policy exclusions are construed narrowly and strictly against the insurer. *See State Farm Fire and Cas. Co. v. ARC Mfg., Inc.*, 11 F.Supp.3d 898, 903 (D. Minn. 2014). Moreover, ambiguous policy language must be interpreted in favor of coverage. *See Wanzek Const., Inc. v. Employers*

29

*Ins. of Wausau*, 679 N.W.2d 322, 325 (Minn. 2004). Under Minnesota law. an insurer may defeat liability by showing prejudice from an insured party's delay in giving notice of a claim. *See Hooper v. Zurich American Ins. Co.*, 552 N.W.2d 31, 36 (Minn. 1996) (citing *Reliance Ins. Co. v. St. Paul Ins. Cos.*, 239 N.W.2d 922, 924–25 (Minn. 1976). However, "[l]ack of notice [of the claim] does not, in and of itself, establish prejudice." *Farmers Ins. Exch. v. Hallaway*, 564 F. Supp. 2d 1047, 1053 (D. Minn. 2008) (citing *Hopper*, 552 N.W.2d at 36.) Rather, the insurer "must show that *during the period where notice should have been given*, the insurer was prejudiced in an articulable manner." (*Id.*)

The Court finds that Maplebrook did not violate the Policy. As an initial matter, neither party interprets whether protectible "property" actually includes the siding that has been removed from Maplebrook's building. The Court has found no case law interpreting a similar policy as treating potentially reusable building materials as covered "property." As "property" is not defined in the Definitions section of the Policy (Policy at 106-08), "property" is an ambiguous term, and ambiguous policy language must be interpreted in favor of coverage, the Court construes "property" to exclude the materials in question.

Even assuming that the removed siding is protectible "property" under the Policy, Hartford's arguments are still unavailing. In all of the cases cited by Hartford for the proposition that Maplebrook breached the Policy, where elements of a building were altered or removed in ways that made an insurer's evaluation or argument about what was owed more difficult, the building owner's work on the building that interfered with the insurer's determination of damages happened before the insurer could view the building,

and in most cases before they were given any notice of a potential claim. *See Cornish Contracting and Real Estate, LLC v. Travelers Indem. Co.*, No. CV065001208, 2008 WL 1822528 at \*2-3 (Sup. Ct. Conn. Apr. 2, 2008) (repair work begun on November 19, notice only reached insurer on November 23, no action taken until November 26); *see also Triple Inv. Grp., LLC v. Hartford Steam Boiler Insp. & Ins. Co.*, 71 F. Supp. 3d 733, 741 (E.D. Mich. 2014) (work performed one month before claim noticed); *Carl v. Or. Auto. Ins. Co. v. North Pac. Ins. Co.*, 918 P.2d 861 (Ore. 1996) (work performed one year before claim noticed).

Conversely, Hartford was given notice of Maplebrook's claim in September 2019, well before the challenged work on the buildings began. Hartford availed itself of the opportunity to send J.S. Held to evaluate the damage in October 2019. (*See* Miller Damage Report; First Sarp Decl., Ex. K (Hartford Statement of Loss).) Hartford was thus aware of the condition of the siding, and could have sought to take samples of the siding at this point. Hartford became aware that Maplebrook opposed the use of harvesting to replace siding by May 2020. (*See* First Sarp Decl., Ex. N (Gavnat Statement of Loss) at 2.) There is undisputed testimony from Mr. Pierce that he informed Hartford "several times" that the siding was being replaced prior to its replacement, but that Hartford did not retrieve any pieces of it. (Pierce Dep. 47:6-48:14.) The removed siding was not disposed of until September or October of 2020, at which point essentially all of the siding on the buildings had been completely replaced. (Muelken Dep. at 55:4–10.) The first express request in the record from Hartford to preserve materials of any kind came on September 28, 2020, with a request to "[leave] any damaged property that has not yet

been agreed to or accepted [] as is, if feasible, to ensure additional inspections of the damages can continue to occur, if necessary[.]" (First Sarp Decl., Ex. T (Sept. 2020 Hartford Statement of Loss).)

The facts of this case are far afield from Hartford's cited cases, where due to an insured party's actions either before the insurer was given notice at all or before the insurer had an opportunity to observe the damage, the insurer's ability to make an independent determination of costs was prejudiced. Rather, here, Hartford had the opportunity to evaluate the damage sufficiently that it could determine its position on the feasibility of harvesting and the concomitant cost of repair long before the siding was removed. Moreover, even if Maplebrook should have preserved the removed siding, Hartford did not attend the appraisal hearing and present evidence—such as J.S. Held's report and documentation or Mr. Miller's testimony, now presented to the Court—that but for the disposal of the removed siding, it could have served as reasonable matching replacement siding pursuant to the Policy. The appraisal panel hearing, as the mutually agreed-upon finder of fact in this dispute, was Hartford's opportunity to be heard, and its failure to attend obviates any prejudice that could have resulted from its argument at the hearing being weakened by Maplebrook's alleged breach. As such, the Court denies Hartford's motion for summary judgment on this basis.

### C. Maplebrook's Alleged Sanctionable Spoliation Of Evidence

Hartford argues that Maplebrook should receive sanctions for spoliation of evidence in the form of denying it recovery of "any additional proceeds for 'matching'." (Def's Summ. J. Br. at 29.) Hartford argues that Maplebrook violated its duty to preserve

the removed siding as relevant material to an expected future litigation, and the fact that the process began with an appraisal is not relevant to whether Maplebrook owed this duty. (*Id.* at 29-30; Def's Supp. Br. at 6-8.) Hartford also argues that, under Minnesota's standard for spoliation provided by *Miller v. Lankow*, 801 N.W.2d 120 (Minn. 2011), whether Maplebrook's destruction of the siding was done in good faith or bad faith is irrelevant to whether it can be sanctioned for spoliation. (Def's Sur-Reply [Doc. No. 101] at 1-3.)

Maplebrook argues that under federal law, in order for the Court to sanction it for spoliation, there must be a finding that it intentionally destroyed the siding in a way indicating a desire to suppress the truth. (Pl's Summ. J. Br. at 14-15.) Maplebrook argues that this is not demonstrated by the facts, as Hartford had sufficient notice that Maplebrook was disputing the value of the loss of the siding but did not instruct Maplebrook to preserve samples. (*Id.*) Maplebrook also argues that it meets the requirements to avoid sanction under *Miller v. Lankow*. (Pl's Supp. Reply Br. [Doc. No. 96] at 3-4.) Maplebrook finally argues that, to the extent it could be sanctioned for spoliation, full preclusion of coverage for the relevant costs would be an inappropriate and disproportionate sanction. (Pl's Summ. J. Br. at 115.)

Federal courts have the inherent power to impose sanctions for destruction, or "spoliation," of evidence. Spoliation sanctions require a significant showing. *See Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) ("A spoliation-of-evidence sanction requires 'a finding of intentional destruction indicating a desire to suppress the truth.'") (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th

Cir. 2004)). "If spoliation is determined, the Court has broad discretion in determining an appropriate sanction and considers the culpability of the party and timing of the actions." *Peterson v. Washinton County*, Civil No. 18-2640 (DWF/ECW), 2021 WL 2686119 at *3 (D. Minn. June 30, 2021) (citing *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 268 (8th Cir. 1993).

The Eighth Circuit has held that in matters before a federal district court under diversity jurisdiction, "federal law applies to the imposition of sanctions for the spoliation of evidence." *Sherman v. Rinchem Co.*, 687 F.3d 996, 1006 (8th Cir. 2012). While Minnesota law provides that "even when a breach of the duty to preserve evidence is not done in bad faith, the district court must attempt to remedy any prejudice that occurs as a result of the destruction of the evidence[,]" *Miller*, 801 N.W.2d at 128, federal law requires a finding of "intentional destruction indicating a desire to suppress the truth." *Sherman*, 687 F.3d at 1006 (citing *Stevenson*, 354 F.3d at 746). Where a direct conflict between federal and state spoliation rules exists, federal rules apply. *Id*. As such, as held in *Sherman*, the standard expressed in *Miller* is inapplicable and the federal standard applies. *Id*.

The evidence before the Court does not support the inference that Maplebrook intentionally destroyed the removed siding in a manner indicating a desire to suppress the truth. As discussed *supra*, Hartford was given notice of Maplebrook's claim in September 2019, and was given notice that Maplebrook opposed the use of harvesting to replace siding by May 2020 at the latest. Yet, the removed siding was not disposed of until September or October of 2020. At that point, essentially all of the siding on the buildings

had been completely replaced. During that intervening year, Hartford had numerous opportunities to obtain samples of the siding or expressly request that Maplebrook preserve samples. Yet, Hartford did not obtain a sample and did not expressly request that Maplebrook preserve materials of any kind, let alone specifically request that samples of the siding be preserved, until September 28, 2020.

While Maplebrook's disposal of the siding may have fallen short of its state-law duty to "preserve relevant evidence for use in litigation" regardless of whether it acted in good or bad faith, *Miller*, 801 N.W.2d at 128, federal law requires a showing of an intent to hide the truth. Hartford cites no federal case law involving a comparable level of access to eventually-destroyed evidentiary material where a spoliation sanction was granted. Maplebrook's conduct does not rise to the level of bad faith, and in the absence of bad faith, the Court cannot grant a spoliation sanction. As such, the Court denies Hartford's motion for summary judgment on this basis.

### D.  Use Of 2019 Or 2020 Pricing To Determine Value

Hartford argues that, pursuant to the plain language of the Policy, the value of the damaged property (and thus the covered cost of replacement) should be determined in light of the costs at the time of the damage, *i.e.*, based on 2019 pricing. (Def's Summ. J. Br. at 32-35.) Hartford argues that the appraisal panel did not make a finding that 2020 pricing should apply because of price increases between 2019 and 2020, but rather agreed that which pricing applied would be determined by reference to the Policy, and included both 2019 and 2020 pricing in the Award and appended statements. (*Id.*)

Maplebrook argues that the appraisal panel decided, by reference to the appended statements, that 2020 pricing should be used. (Def's Summ. J. Br. at 32-25.)  Maplebrook argues that this follows logically, as the appraisal was not held until 2020, and in the intervening period, prices increased for certain types of repairs. (*Id*.)

As with the parties' dispute concerning whether matching siding and electrical is covered by the Award, the best reading of the Award in light of the appraisal panel's clarification is that the panel determined how much would be owed under either 2019 or 2020 pricing, and left the issue of whether there was coverage for increased repair costs for the Court. Much as the appraisal panel provided RCV amounts both with and without matching siding and electrical and left it to the Court to determine which amount should apply, the panel did the same here. This is further indicated by Mr. Moe's email stating that:

> The appraisal panel unanimously agreed that the statements do not make any decision regarding policy provisions or define policy coverages and that these are coverage questions to be resolved between both sides. Scott Moe and Brad Langerman agree that the 2020 percentage increases are not a part of the 2019 award amounts.

(First Sarp Decl., Ex. R (Appraisal Award and Statements) at 7.) As such, the Court must determine whether the Policy covers increased costs for repair.

Hartford's reading of the Policy language is persuasive. The Policy states that "[i]n the event of covered loss or damage, we will determine the value of Covered Property at the actual amount spent to repair, replace or rebuild the damaged property *as of the time of the loss or damage*, at the same site or another site[.] (Policy at 121)

(emphasis added). This language is unambiguous, defining the damages under the RCV measure—and thus the maximum covered costs—at the time of loss.

While the case law cited by Hartford is not binding on this Court, the rulings of this Court's sister districts interpreting similar provisions in similar insurance contracts are persuasive. *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291 (HB), 2006 WL 3073220 at *7-10 (S.D.N.Y. Oct. 31, 2006) (explaining the background and goals of RCV insurance policies and holding that policy language providing that "replacement cost be determined 'as of the time and place of loss' dictates that the relevant benchmark is the amount it would cost to reproduce the [World Trade Center] as of the time and place of loss—*i.e.*, as it existed early on the morning of September 11, 2001."); *see also Snoqualmie Summit Inn, Inc. v. Travelers Prop. & Cas. Co. of Am.,* No. CV06-0517 MJP, 2007 WL 709297 at *2 (W.D. Wash. Mar. 5, 2007).

Maplebrook's counterarguments are unavailing. As discussed *supra*, the Court disagrees with its reading of the appended statements from two members of the appraisal panel as deciding that 2020 prices apply, rather than making factual findings as to 2019 and 2020 pricing and leaving the decision of the applicable measure of damages to the Court. Similarly, while Maplebrook cites *Axis Surplus Ins. Co. v. Condor Corp.*, Civil No. 20-789 (DSD/KMM), 2023 WL 1767269 at *2-3 (D. Minn. Feb. 3, 2023) for the proposition that 2020 pricing should apply, this case is inapposite. In *Axis Surplus*, the contractual language governing RCV valuation did not include time-of-loss language, but rather a requirement that the insured party actually repair or replace the insured property (and do so as soon as possible after the damage) before they would be paid. *Id*. at *2. The

Court determined that more recent (July 2022) price lists would be used to determine the cost rather than prices contemporaneous to the May 2018 damaging event because the insurer had substantially delayed the case. *Id*. at *3. Conversely, here, there is no such delay.

The Award, as clarified by the appraisal panel, leaves the determination of the appropriate measure of damages to this Court. The Policy is clear that the benchmark is the value of the property at the time it was damaged or lost, which in this case is 2019. As such, the Court denies Maplebrook's motion and grants Hartford's motion for summary judgment on this basis.

### E.  Interest Calculation

Hartford argues that, pursuant to Minnesota law, pre-award interest is calculated from the date that Maplebrook provided Hartford with loss statements sufficiently detailed to constitute a notice of claim, which occurred on May 6, 2020. (Def's Summ. J. Br. at 35-27.) Hartford also argues that it is entitled to offsets for payments made to Maplebrook before the Award was issued, as otherwise it is overpaying interest. (*Id*. at 37-38.) Finally, Hartford argues that it does not owe post-judgment interest unless the Court determines that it owes additional costs for matching siding and electrical and/or 2020 pricing. (Def's Summ. J. Reply Br. [Doc. No. 80] at 9-10.)

Maplebrook argues that Hartford owes pre-Award interest measured from October 2, 2019, as it argues that it provided Hartford with sufficient notice to fulfill the requirements of Minnesota law as of that date. (Pl.'s Opp'n at 20–24.)   Moreover,

Maplebrook argues that as Hartford owes additional costs for matching siding and electrical and/or 2020 pricing, it is liable for additional pre and post-Award interest.

### 1. Start Date

Minnesota law provides that the default rule for calculating interest on damages computes damages from "the time of the commencement of the action or a demand for arbitration, or the time of a written notice of claim, whichever occurs first[.]" Minn. Stat § 549.09 subd. 1(b). To qualify as a notice of claim, a "written notice must be sufficient to allow the noticed party to determine its potential liability from a generally recognized objective standard of measurement." *Blehr v. Anderson*, 955 N.W.2d 613, 620-21 (Minn. Ct. App. 2021). This does not require a demand for a specific amount of money. *Id*. at 621. A notice of claim for an insurance claim must be sent from the claimant to the insurer—a report generated entirely by the insurer does not count. *Elm Creek*, 971 N.W.2d at 741.

Whether notice is sufficient to trigger the beginning of statutory interest is a fact-specific inquiry. *Selective Ins. Co. of South Carolina v. Sela*, 455 F.Supp.3d 841, 867-69 (D. Minn. 2020), *aff'd* 11 F.4th 844, 851 (8th Cir. 2021) (holding that interest began running from date that defendant submitted insurance claim rather than date that suit was filed, as filing an insurance claim was necessarily a claim for damages); *Creekview of Hugo Ass'n, Inc. v. Owners Ins. Co.*, 386 F. Supp. 3d 1059, 1068-1071 (D. Minn. 2019); *Herll v. Auto Owners Ins. Co.*, No. 15-CV-3104 (MJD/FLN), 2018 WL 4759833 at *3-4 (D. Minn. Oct. 2, 2018); *Housing and Redevelopment Auth. of Redwood Falls v. Housing*

*Auth. Prop. Ins.,* No. 14-cv-4741 (PAM/HB), 2017 WL 5197135 at *2 & n.2 (D. Minn. Nov. 8, 2017).

Maplebrook's notice on October 2, 2019 was sufficient to constitute a valid notice of claim under state law. Hartford first received notice that some amount of damage had occurred to Maplebrook's properties on or prior to September 9, 2019, in response to which Hartford acknowledged that Maplebrook had made a claim but sought more information. (*See* Brandis Decl., Ex. C (Sept. 9, 2019 Email).) On October 2, 2019, Mr. Pierce sent Mr. Becker an estimate, stating that it was "the initial estimate for roofs only. We pulled ITELS for the 4 different siding colors. As soon as we have that we will updat[e] the sides, soft metal, AC and gutters." (First Sarp Decl., Ex. Y.) Mr. Pierce's email therefore included cost estimates for the roofs and provided information about what other parts of the structures Maplebrook believed would need repair or replacement. Also in October, Hartford's representatives inspected Maplebrook's damaged buildings. (*See* Miller Damage Report; First Sarp Decl., Ex. K (Hartford Statement of Loss).)

This is a greater degree of detail in a written communication from the claimant to the insurer than was found sufficient for a valid notice of claim in *Sela*. There, following a hailstorm that caused damage to his property:

> Sela submitted a claim to Selective on July 8, 2015. In response, Selective sent an independent appraiser (Bryan Walton) to inspect the property. After briefly examining the damage, Walton told Sela that he had "a catastrophic claim" and that Walton would "not be handling it any longer." Walton submitted a loss report to Selective. BT Pls. Ex. 2. In his report, Walton noted that Sela told him "that the entire exterior of [the] dwelling was redone approximately 3 years ago."

> About three weeks later, Selective sent two of its own employees—David Clark and Charlie Hubbard—to inspect Sela's property. Clark and Hubbard (accompanied by Sela) spent several hours examining the damage. Sela told Clark and Hubbard that the exterior of the home had been completely re-done five or six years ago. Sela also explained that the property had sustained damage in a prior hailstorm, and that Lexington[, another insurer,] had indemnified him for that damage…By the time that Clark and Hubbard finished their inspection, they knew that some of the damage from the 2010 hailstorm had been repaired and some of it had not. Sela later submitted photos to Selective on which he marked portions of his property that he had not repaired after the 2010 hailstorm.

455 F.Supp.3d at 846. Sela's initial claim on July 8, 2015 contained essentially no detail about the damage, but Judge Schiltz treated it as sufficient, because filing a claim was implicitly a demand for compensation and "the information that Sela provided would have enabled Selective to assess its potential liability." *Id.* at 869. The Eighth Circuit affirmed, holding that notice was sufficient, as "Selective knew from the loss notice that there was hail damage to the roof of a property covered by a $1.6 million policy. Three days after the notice, Selective assigned its first adjuster. And two days after that, the adjuster was investigating the damage." 11 F.4th at 851.

The example provided by *Sela* most closely tracks the facts of this case, and *Sela* is the binding Eighth Circuit case that most closely follows the standard espoused by the Minnesota Court of Appeals in *Blehr v. Anderson*.[11] As such, the Court holds that pre-

---

[11] While the holdings of *Herll* and *Housing and Redevelopment Authority of Redwood Falls*—cited by Hartford—have not been overturned, as Judge Tostrud explained, neither case engages with *Blehr* or its progenitor, *Indep. Sch. Dist. 441 v. Bunn-O-Matic Corp.*, No. C0-96-594, 1996 WL 689768 (Minn. Ct. App. Dec. 3, 1996), which set the standard in this area. *See Creekview of Hugo Ass'n, Inc.*, 386 F. Supp. 3d at 1071.

judgment and pre-Award interest should be measured from October 2, 2019, and grants summary judgment to Maplebrook on this basis.

### 2. Offsets

Hartford argues that it is "entitled to offsets for the payments it made during the course of the claim leading up to appraisal." (Def's Summ. J. Br. at 37-38.) Maplebrook is silent as to this argument.

By statute, pre-award interest is owed only on pecuniary damages. Minn. Stat. § 549.09, subd. 1(b). The purpose of pre-award interest is to "(1) compensat[e] the plaintiff for the loss of use of the money, and (2) promot[e] settlement." *Creekview of Hugo Ass'n, Inc.*, 386 F. Supp. 3d at 1072. Both state and federal courts have held that once an insurer has made payment to the insured party, the insured party has "[the] money in hand and needs no compensation for the loss of its use." *Id.* at 1071-72; *see also Elm Creek*, 971 N.W.2d at 743.

Here, Hartford made substantial payments to Maplebrook prior to Maplebrook's demand for appraisal and the panel's subsequent Award. As Maplebrook has made no argument against granting offsets and raised no countervailing case law, the Court holds that while Maplebrook is entitled to pre-award interest, this entitlement comes with an offset for Hartford's prior payments, and grants summary judgment to Hartford on this basis.

### 3. Post-Award Interest

Maplebrook seeks post-award interest on the unpaid portion of the Award. Hartford argues that it is not obligated to pay post-Award interest, as "[u]nless and until

Maplebrook establishes it is entitled to additional monies under the Award for matching and/or 2020 price increases, Hartford's payment on May 11, 2021 fully satisfied the Award[.]" (Def's Summ. J. Reply Br. at 9-10.)

"In a diversity action, state law governs prejudgment interest; federal law governs postjudgment interest." *Happy Chef Sys., Inc. v. John Hancock Mut. Life Ins. Co.*, 933 F.2d 1433, 1435 (8th Cir. 1991). Under Minnesota law, post-award interest is governed by Minn. Stat. § 549.09, subdivision 2, which provides that interest shall accrue "from the time that [the judgment or award] is entered or made until it is paid[.]" The applicable interest rate is ten percent per year until paid. *Id*. at subd. 1(c)(2). Conversely, federal law provides for post-judgment interest by calculating "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). Interest is computed daily to the date of payment and compounded annually. 28 U.S.C. § 1961(b).

This Court previously considered the distinction between post-appraisal award interest and post-judgment interest in *Savanna Grove Coach Homeowners' Ass'n v. Auto-Owners Ins. Co.*, No. 19-cv-1513 (ECT/TNL), 2020 WL 468905 (D. Minn. Jan. 29, 2020). There, Judge Tostrud held that "post-award interest is understood to mean interest beginning upon the *issuance of the appraisal award*, and post-judgment interest is understood to mean interest beginning upon the *entry of judgment*." *Id*. at *9 (emphasis added). As such, for interest accruing after the appraisal award was issued, but before a

judgment is entered by the federal court, Minnesota state law applied. The Court finds Judge Tostrud's analysis persuasive, and follows the Court's prior ruling.

As discussed, *supra*, the Court grants summary judgment to Maplebrook on the issue of whether the Award and Policy entitle it to payment for new matching replacement siding, and to Hartford on the issue of whether 2019 or 2020 costs apply. As such, Maplebrook is entitled to post-Award interest on the outstanding amount due for matching only, and grants in part and denies in part Maplebrook's motion on this basis. Post-award interest will be calculated at 10% per year on the unpaid balance of the appraisal award from the time of the Award until entry of judgment, while any post-judgment interest will be calculated pursuant to federal law.

### F.  Disputed Payment On The December 13, 2021 Invoice

Hartford argues that it is not obligated to pay the outstanding balance of $486,304.88 from Maplebrook's December 13, 2021 invoice, as the Policy only requires that, under an RCV calculation, Hartford pay for the least of the actual amount that it costs to repair the property or the amount Maplebrook actually spent to repair the property. (Def's Summ. J. Br. a 30-31.) Hartford argues that Maplebrook has not provided sufficient evidence that it actually paid for additional repairs or what work was actually performed, as the invoice and deposition testimony of Maplebrook's contractors provide little information and suggest that no additional expenditures covered by the Policy were incurred. (*Id.* at 31-32.)

Maplebrook argues that it provided an invoice to Hartford through its contractor, Capital, and that this is sufficient evidence of its repair work for payment to be owed by

Hartford. (Pl.'s Opp'n at 16-17.) Maplebrook argues that Hartford provides no documentary evidence to support its supposition that Capital either did not perform the claimed work or that said work was not covered by the Policy, and suggests that Hartford's argument creates a new, unclear threshold of evidence required to prove that it paid the RCV amount to Hartford's satisfaction. (*Id*.)

The Policy's provision that limits payment to the least of the insurance limit, the cost of replacement, and the amount actually spent is not ambiguous. (*See* Policy at 106.) Therefore, Hartford is only liable to pay the lowest of "the limit of liability, the replacement cost for equivalent construction and use, or the amount actually spent to repair the damage." *See Estes v. State Farm Fire & Cas. Co.*, 358 N.W.2d 123 (Minn. Ct. App. 1984) (considering a similar provision). The remaining dispute is how much was actually spent on covered repairs, which was not considered by the appraisal panel.

This Court considered a similar claim in *Savanna Grove Coach Homeowners' Ass'n*. There, the defendant insurer refused to pay the difference between what it had already paid and the amount of an appraisal award, arguing that the plaintiff's final invoices for the project were insufficient to show that the plaintiff had paid, and therefore was not obligated to pay more than the amount actually spent. 2020 WL 468905 at *3, *5. Judge Tostrud disagreed with the defendant and, "recognizing that doubts do not create a triable controversy," held that the plaintiff's record of payment—which included itemized invoices—was sufficient. *Id*. at 6-7. Judge Tostrud found that the plaintiff's responsibilities under the insurance policy—to provide an inventory of property, permit inspection of property and records proving loss or damage, allow questioning under oath,

and to cooperate with an investigation—did not require a more fulsome production. *Id.* Judge Tostrud noted that while the defendant alleged that the plaintiff's final invoice was "simply pegged to match the Appraisal Award[,]" it cited no evidence supporting its interpretation. Without evidence, "supposition about why the numbers align does not create a genuine fact dispute." *Id.* at 7 (citing *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019).)

As in *Savannah Grove*, Hartford argues that Maplebrook's invoice is insufficient to show that they have incurred covered expenditures. Moreover, the Policy contains near-identical general duties for Maplebrook in the event of a loss or damage: prompt notice; protection of property from further damage; provision of a detailed inventory of lost or damaged property to Hartford; permission for Hartford to inspect the property and Maplebrook's records as required; a signed and sworn proof of loss statement within 60 days of Hartford's request; and a general duty to cooperate. (*See* Policy at 106.) The Policy also requires Maplebrook to allow Hartford to "examine any insured under oath" on matters relating to the insurance policy or claim. (*Id.*)

However, while Judge Tostrud found that the record submitted by the plaintiff in *Savannah Grove* was "extensive," 2020 WL 468905 at *5, the same cannot be said for Maplebrook's record. The December 13, 2021 invoice contains essentially no information about what work is being invoiced, saying only that it was for "All repair as outlined in the adjusters summary and appraisal award[.]" (Dec. 13, 2020 Capital Invoice.) No witnesses could identify the specific work to which the final invoice corresponded, although Mr. Pierce believed that it concerned "deck painting and [] HVAC" work. (*See*

McLarty Dep. at 60:6–62:4; Pierce Dep. at 82:3–86:7; Muelken Dep. at 109:2-25.) Mr. Muelken stated that he did not have any involvement in coming up with the invoice amount, even though he was the representative of the contractor performing the work, and that "[the invoice] was requested from Gavnat so they can have that to submit to the carrier." (Muelken Dep. at 109:9-11.) Together, the evidence suggests that, as the defendant in *Savannah Grove* posited, the December 13, 2021 invoice was not for work performed but rather simply pegged to match the Award.

Even assuming that some work was performed, there is insufficient evidence in the record before the Court to find for Maplebrook. No reasonable jury could find for Maplebrook in the absence of any testimony specifying what work was covered by the December 13, 2021 invoice. Mr. Pierce's speculation that the invoice concerned "deck painting and [] HVAC" work, without any documentary evidence or even confirmation by the contractor performing the work, falls far short of establishing "specific facts which create a genuine issue for trial." *Krenik*, 47 F.3d at 957 (8th Cir. 1995); *see also Zayed v. Associated Bank,* N.A., 913 F.3d 709, 720 (8th Cir. 2019) ("To show a genuine dispute of material fact, a party must provide more than conjecture and speculation.")

There is no genuine issue of material fact concerning Maplebrook's December 13, 2021 invoice. As such, the Court denies Maplebrook's motion and grants Hartford's motion for summary judgment on this basis.

## IV.   CONCLUSION

Accordingly, based on the submissions and the entire file and proceedings herein,

**IT IS HEREBY ORDERED** that

1.    Defendant's Motion for Summary Judgment [Doc. No. 65] is **GRANTED IN PART** and **DENIED IN PART**;

2.    Plaintiff's Motion for Summary Judgment [Doc. No. 73] is **GRANTED IN PART** and **DENIED IN PART**

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: February 29, 2024                         s/ Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge